[No. B085542. Second Dist., Div. Seven. Jan. 18, 1995.]

CONTINENTAL INSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
COMMERCIAL BUILDING MAINTENANCE COMPANY et al., Real
Parties in Interest.

[Nos. B086196, B086564. Second Dist., Div. Seven. Jan. 18, 1995.]

INSURANCE COMPANY OF NORTH AMERICA et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
COMMERCIAL BUILDING MAINTENANCE COMPANY et al., Real
Parties in Interest.

[Nos. B086221, B086686. Second Dist., Div. Seven. Jan. 18, 1995.]

ALLIANZ UNDERWRITERS, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
COMMERCIAL BUILDING MAINTENANCE COMPANY et al., Real
Parties in Interest.

[Nos. B086326, B086811. Second Dist., Div. Seven. Jan. 18, 1995.]

FEDERAL INSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
COMMERCIAL BUILDING MAINTENANCE COMPANY et al., Real
Parties in Interest.

96

## Counsel

McDermott, Will & Emery, Richard K. Simon, Robyn-Marie Lyon
Monteleone, Cozen & O'Connor, Jay M. Goldstein, Long & Levit,

Guy D. Calladine, Clausen, Miller, Gorman, Caffrey & Witous, George A. Zelcs, Edward M. Kay, Susan Condon, Christensen, White, Miller, Fink & Jacobs, James L. Schreier and Frances Ehrmann for Petitioners.

No appearance for Respondent.

Greenberg, Glusker, Fields, Claman & Machtinger, Harvey R. Friedman, Joseph M. Cahn, Kevin L. James and Kelly A. Coleman for Real Parties in Interest.

## OPINION

**LILLIE, P. J.**—This consolidated proceeding involves seven petitions for writ of mandate; in four of such petitions, petitioners, plaintiffs in the action below, seek to vacate those parts of the trial court's orders of June 27, 1994, and August 4, 1994, precluding petitioners from calling Francisco Robleto, a former employee of real party in interest and defendant Commercial Building Maintenance Company (CBM), as a witness or using his testimony or statements at any hearing or trial; in three of the petitions, petitioners seek to vacate an August 17, 1994, order granting CBM's motion to suppress the testimony of another former employee of CBM, Margarita Fleites, on the ground that "Plaintiff's attorneys [ex parte] contact with Fleites was improper and was in violation of [California State Bar Rules of Professional Conduct], rule 2-100." The principal issue raised by the petitions is whether the trial court abused its discretion in precluding petitioners from admitting testimony of two former employees of CBM at any hearing or trial.

### FACTUAL AND PROCEDURAL BACKGROUND

The underlying litigation arises out of a May 4, 1988, fire at the First Interstate Tower; the proceeding is comprised of a wrongful death and several personal injury actions consolidated with 12 property damage cases brought by tenants or subrogated insurers of tenants of the First Interstate Tower who allegedly sustained property damages in the fire. The wrongful death and some of the personal injury actions were settled before some of the 12 property damage cases were filed. Petitioners herein, some of the plaintiffs in the property damage actions, sued, inter alia, defendants and real parties in interest CBM and Cleaning Corporation of America (CCA), which acquired CBM a few weeks after the fire. Petitioners alleged that CBM's employees blocked open fire doors and failed to report and/or act upon unusual or burning odors in the building several hours prior to the time that building security was notified of the fire.

In 1991, petitioners entered into a "Joint Prosecution Agreement" to govern their respective rights and obligations in the litigation. Under the Joint Prosecution Agreement, upon consummation of settlement agreements with other defendants not parties herein, the "Major Subrogation Plaintiffs" (Insurance Company of North America, Continental Casualty Company, Continental Insurance Company, and the Allianz group of plaintiffs) "shall have the right and obligation to direct the further prosecution of the Action on all issues of liability (but not on the issue of damages) as to all remaining defendants." Eight other plaintiffs, including petitioners Federal Insurance Company and Vigilant Insurance Company, referred to in the agreement as part of the "Little Eight," were obligated to "cooperate with the Major Subrogation Plaintiffs," and "make available all discovery heretofore taken in the Action by the Little Eight . . . ."

We proceed to set out the factual background with respect to the orders pertaining to Francisco Robleto, and then with respect to the order pertaining to Margarita Fleites.

A. *June 27, 1994, and August 4, 1994, Orders (Mr. Robleto; Petition Nos. B085542, B086196, B086221, and B086326)*

In May 1994, defendants CBM and CCA filed a motion to disqualify Attorney Jay M. Goldstein and the law firm of Cozen & O'Connor, counsel for plaintiffs Continental Casualty Company, Insurance Company of North America, Continental Insurance Company and cross-defendant First Interstate Bank of California, on the ground that Goldstein "intentionally misrepresented himself as the attorney representing CBM to Mr. Francisco Robleto, a former Supervisor at CBM and a witness in this litigation, thereby (1) obtaining an unfair advantage in this litigation, and (2) violating American Bar Association Model Rules of Professional Conduct, Rules 4.1 and 4.3."[1] CBM claimed that the alleged misconduct "continues to have a prejudicial effect on defendant CBM as the information obtained as a result thereof will likely be used advantageously against CBM throughout the course of this litigation." The motion was supported by declarations of Robleto, Kevin James, an attorney for CBM and CCA, and Robert Clunie, a former CBM employee.

---

[1]American Bar Association (ABA) Model Rules of Professional Conduct, rule 4.1 (ABA rule 4.1) provides in pertinent part that "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person . . . ."

ABA Model Rules of Professional Conduct, rule 4.3 (ABA rule 4.3) provides: "In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."

Robleto declared that on May 4, 1988, he was employed by CBM as a night supervisor at the First Interstate Tower; he reads and speaks both English and Spanish fluently; on February 7, 1994, Kevin James of the firm of Greenberg, Glusker, Fields, Claman & Machtinger, contacted him to discuss the fire; James introduced himself as the attorney representing CBM; he told James that he had already been interviewed a few weeks before by the attorney representing CBM in relation to the fire; James asked him to identify the other attorney; he could not remember the other attorney's name, but he had a business card with the name of Jay Goldstein from Cozen & O'Connor; James told him that he, not Goldstein, represented CBM; he and James then discussed the events surrounding the fire; on February 14, 1994, he and James met for about one hour; at that meeting, he told James that he had met with Goldstein for about 90 minutes; Goldstein showed him numerous documents and he reviewed and discussed the documents with Goldstein, as well as discussed the events surrounding the fire; Goldstein told him that he (Goldstein) was friends with Robert Clunie and had recently met with Clunie. At Robleto's February 14, 1994, meeting with James, Robleto executed a declaration stating that prior to knowing that there was a fire in the First Interstate Tower, he never smelled any strange or unusual smell, he never smelled smoke or a burnt or burning smell; while working for CBM, he never saw or heard of trash bags blocking the fire doors in the service elevator lobby on any floor; he never received any complaints that trash bags were blocking the fire doors; he remembers seeing a refrigerator, vending machine and other items being stored in the 12th floor service elevator lobby.

Attorney Kevin James declared that on February 7, 1994, he contacted Robleto for the first time to discuss events related to the fire; Robleto was "absolutely sure" that Goldstein had told him that he (Goldstein) represented CBM. Robert Clunie declared that he is not friends with Goldstein and the only contact he had with him occurred in October 1993 when Goldstein asked him questions at a deposition in this action.

The Continental Insurance Company plaintiffs (hereafter referred to collectively as Continental Insurance), as well as plaintiff Frederick W. Hill, opposed the motion on the grounds that Mr. Goldstein did nothing wrong, did not misrepresent his clients to Robleto, did not obtain an unfair advantage, and any information obtained from Robleto was known from prior discovery with respect to other witnesses in the case.

In opposition to the motion, Attorney Dean Rauchwerger, an attorney representing the Allianz group of plaintiffs, declared that his firm, Clausen

Miller, Gorman, Caffrey & Witous (Clausen Miller), located Mr. Robleto, a former CBM employee, in San Diego in November 1993; on January 9, 1994, he telephoned Robleto, told him whom he represented, and confirmed that Robleto was no longer a CBM employee and was not represented by counsel; Robleto agreed to meet with one of his (Rauchwerger's) colleagues on January 12, 1994, to discuss the events surrounding the May 1988 fire; as Clausen Miller coordinates the prosecution of the instant actions with two other law firms representing other plaintiffs and cross-defendants in the consolidated litigation, it was agreed that Goldstein, who lives in San Diego, was to conduct the meeting.

According to Goldstein's declaration, he introduced himself to Robleto on January 12, 1994, and told him he was working with Rauchwerger and represents First Interstate Bank, First Interstate Tower and their insurance companies; he never indicated that he represented CBM; he told Robleto that he had previously met a CBM employee, Mr. Clunie, who seemed like a "nice fella," and they discussed Clunie's deposition testimony; he also discussed with Robleto other documents and asked him essentially the same questions about the fire as he has asked over 200 other nonparty witnesses in the case, who were either nonmanagerial level ex-employees of various defendants or independent percipient witnesses.

Goldstein also declared that he received a February 18, 1994, letter from the Greenberg firm, CBM's counsel, charging him with "blatant and unethical conduct" in misrepresenting to Robleto that he (Goldstein) was CBM's lawyer and that he was good friends with Clunie. Goldstein's February 22, 1994, letter in response denied any misrepresentations.

Attorney George Zelcs, with the Clausen Miller firm, representing the Allianz plaintiffs, declared that after reading the Greenberg firm's February 18 letter, he telephoned Robleto and identified himself as an attorney for the First Interstate Tower and its insurers; he reconfirmed that Robleto was not employed by CBM and was not represented by counsel; on March 8, 1994, he arranged to personally meet Robleto at his home on March 14, 1994; at that meeting, Robleto stated that he had been interviewed by other lawyers in the litigation, but could not name them or their clients; Zelcs asked Robleto if he had met with a Mr. Goldstein, and Robleto replied that he believed he had, but appeared uncertain of who Goldstein was or which parties he represented; Robleto also indicated that he had spoken to Kevin James of the Greenberg firm and had signed a statement prepared by Mr. James. Zelcs discussed the events surrounding the fire with Robleto and Robleto signed a statement memorializing his recollection of the facts

surrounding the fire; Zelcs also told Robleto that he would probably formally take his deposition; he left Robleto with his business card and wrote the name of his client, First Interstate Tower, on the card; later, Robleto agreed to accept service of a subpoena for a June 1, 1994, deposition.

According to Robleto's March 14, 1994, declaration, Robleto was told the day after the fire by Noel Estrada that he had spoken with Margarita Fleites, a janitor working on the night of the fire; Fleites told Estrada that on the evening of the fire, she left early because she had become sick from smelling something burning; he (Robleto) was told by Zora Cadovec, Fleites's boss, the day after the fire that Fleites had left early because she had become sick from smelling something burning; the day after the fire, he went to the CBM office in Glendale where he met with Bob Clunie and Jim Harris and informed them of the activities of CBM employees in the building on the night of the fire.

In Robleto's June 1, 1994, deposition testimony, he admitted that when he met with Zelcs on March 14, he (Robleto) told Zelcs that he had met with Goldstein but he was confused and was not sure whom Goldstein represented; Robleto also admitted meeting with James and that he knew James represented CBM. Robleto also testified in deposition that he did not know whether Noel Estrada or Zora Cadovec spoke directly with Fleites, but Estrada and Cadovec told him that there were rumors that Fleites had left early on the day of the fire because she had become sick from smelling something burning; he did not discuss the rumors about Fleites smelling something burning with Clunie or Harris at the Glendale meeting.

After oral argument on CBM's motion to disqualify on June 8, 1994, the court continued the matter to June 22, 1994, and in the interim ordered that CBM be afforded the opportunity to depose Goldstein on the subject of his conversation with Robleto. According to Goldstein's deposition testimony, he did not tell Robleto that he represented CBM or that he was good friends with Clunie; he also did not tell Robleto that his clients were adverse to CBM in the lawsuit, or the nature of any of the plaintiffs' claims against CBM; Robleto told him (Goldstein) that on the night of the fire, he was on the 42d floor working on payroll in the CBM office; the first awareness he had of a fire was a public address system announcement about it.

In CBM's supplemental brief filed in support of its motion to disqualify Goldstein and the Cozen & O'Connor law firm, CBM argued that Goldstein's conduct in communicating with Robleto was improper in that Goldstein misrepresented Fleites's deposition testimony to Robleto, and "programmed" Robleto for his deposition testimony that Fleites was sick from

smelling something burning; according to CBM, neither Fleites nor Cadovec testified in deposition that Fleites told Cadovec she was sick because she smelled something burning; according to CBM, Fleites testified she told Cadovec that she was sick because she "had smelled something, smelling something strange."

In supplemental opposition by the Continental Insurance plaintiffs, plaintiffs argued that the basis of the motion changed from Goldstein's alleged misrepresentation of the identity of his client to his alleged conduct in influencing or "tainting" Robleto's deposition testimony; neither occurred and there was no basis for disqualification.

On June 22, 1994, the court took the matter under submission. On June 27, 1994, the court issued an order which stated: "Mr. Robleto was misled by statements of, or a failure to make relevant disclosing statements by, Mr. Goldstein. Nevertheless, the information obtained is information that would have developed in the case in any event, because it is important information and the disclosure of which may shed light on the sequence of events. The disadvantage to moving parties is not such to warrant disqualification. The assertion that by having the Robleto information responding party was able to more deftly elicit deposition testimony from Robleto is without any disadvantageous consequences to any party. If responding party did not ask proper questions or did so in an improper manner, then others at the deposition had the opportunity to register objections. [¶] Disqualifications at this stage of the case for the objected to action would serve no purpose. [¶] The motion is denied on the following conditions: The clients of responding party, Cozen & O'Connor, and any party on the same side of the case as those clients, are prohibited from using, either directly, indirectly or on cross-action, Robleto's deposition and any declaration or statement of Robleto. Further, said clients may not hereafter call or present Robleto as a witness at any hearing or trial."

The Allianz group of plaintiffs, the Insurance Company of North America group of plaintiffs, and plaintiffs Federal Insurance Company, and Vigilant Insurance Company moved the court to reconsider its order of June 27, 1994; after oral argument on August 4, 1994, the court took the matters under submission; a minute order of that date stated that "Motions to reconsider granted. Upon reconsideration the court affirms the 6/27/94 order."

Petitioners filed four petitions for writ of mandate challenging the June 27 and August 4, 1994, orders insofar as they preclude petitioners from using

Robleto's testimony; in other words, petitioners do not challenge that part of the order denying the motion for disqualification, but only the conditions attached to that denial.

B. *August 17, 1994, Order (Ms. Fleites; Petition Nos. B086564, B086686, B086811)*

In July 1994, CBM and CCA filed a motion to "suppress all testimony, declarations and statements of Margarita Fleites," a former CBM employee unrepresented by counsel, on the ground that Attorneys George Zelcs, Jean-Pierre Ruiz, and the Clausen Miller firm, attorneys for the Allianz group of plaintiffs, engaged in ex parte communications with Fleites, in violation of California Rules of Professional Conduct, rule 2-100 (rule 2-100), its ABA Model Rule counterpart, ABA Model Rules of Professional Conduct, rule 4.2 (ABA rule 4.2), and ABA rule 4.3 (*ante,* fn. 1).[2]

Defendants' motion was based on ex parte contacts which Fleites discussed in her December 15, 1993, deposition. Defendants alleged that shortly before her deposition, Fleites met on several occasions with Zelcs and Ruiz to discuss her employment with CBM and the circumstances surrounding the fire; they did not explain to Fleites that "their clients were suing CBM or that their clients alleged that CBM was at fault for damage resulting from the fire or that Fleites herself was at fault for damage resulting from the fire." Defendants interpreted rule 2-100 to apply to contacts with unrepresented former corporate employees when the subject of the communication involves an act or failure to act by the employee in connection to the matter which may be imputed to the corporation, and asserted that Fleites was not merely a witness to events and actions taken by CBM while she was employed there, but Fleites was one of the primary actors for CBM with respect to the conduct giving rise to the lawsuit.

---

[2]Rule 2-100 states in pertinent part: "(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer. [¶] (B) For purposes of this rule, a 'party' includes: [¶] (1) An officer, director, or managing agent of a corporation or association, and a partner or managing agent of a partnership; or [¶] (2) An association member or an employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. . . ."

ABA rule 4.2 provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

Defendants also maintained that counsels' violations of the ethical rules warrant the suppression order because without such order, "plaintiffs will unfairly benefit from their counsel's 'coordinated' misconduct." Defendants alleged that Fleites's deposition testimony demonstrated "the crucial adverse impact of Ruiz's and Zelcs' ex parte communications" in attempting to "manufacture testimony favorable to plaintiffs," in that under questioning at her deposition, Fleites allegedly repudiated statements in a prior declaration obtained by Zelcs and Ruiz.

Defendants' motion was opposed by the Allianz plaintiffs, the Continental Insurance plaintiffs, the First Interstate plaintiffs, plaintiffs Insurance Company of North America, Federal Insurance Company, Vigilant Insurance Company, and Frederick W. Hill. Plaintiffs opposed the motion on the grounds that the motion was simply a tactical maneuver in that CBM and its counsel were aware of plaintiffs' contacts with Fleites in September 1993 and raised no objection until July 1994; Fleites had given prior statements in 1988 to a City of Los Angeles Fire Department investigator and to CBM's insurance adjuster, and in 1989 had given a deposition, which were all consistent with her December 1993 deposition testimony; plaintiffs' counsel did not violate rule 2-100 or the ABA Model Rules of Professional Conduct because the rules do not prohibit communication with *former* employees of an adverse party.

The evidence opposing the motion revealed that Fleites worked for CBM until June 1990; according to a May 9, 1988, recorded statement summary by CBM's insurance adjuster, Fleites stated that when she was leaving the bags of trash near the freight elevator door on the 12th floor, "she smelled something strong like sulfite," and she "thought that the smell could come from the trash but she did not mention this to anyone"; she has diabetes and high blood pressure and was under medication but that day she did not take her medication and did not eat anything; Fleites "thought to report to her supervisor about the strong odor she smelled but she thought they would not believe her . . . ."

According to portions of Fleites's March 1989 deposition testimony, she smelled something burning on the 12th floor and was nauseous, so she left work at about 8:30 p.m.; before she left, she did not tell Zora Cadovec, her boss, or anyone there that she thought she had smelled something burning; the smell was "like when you get a match open," and "like a candle that's burning."

In Fleites's handwritten statement in Spanish, given to Zelcs and Ruiz in October 1993, which statement was translated into English during Fleites's

December 1993 deposition, Fleites characterized the smell as "like plastic or cable burning," and stated that she had never smelled a similar smell before that evening, and that she told Zora in Spanish that she could smell something burning on the 12th floor.

In Fleites's December 1993 deposition, taken in Las Vegas, Nevada, Fleites was asked what she told Zora before she left work on the night of the fire; Fleites responded, "That I needed to go home because I was feeling sick; that I had smelled something, smelling something strange. What I said about plastic or similar to other smells, it was something that I said thinking, trying to find to match that smell. I've been trying to match that smell, but I can't, that smell, that's what I said. It has been for me to try if I can find out what the smell was, but I haven't been able to find it. It's not firm because I don't know what it was. It was something strange."[3]

After oral argument on CBM's motion to suppress all testimony of Fleites, the court took the matter under submission. On August 17, 1994, the court issued the following minute order: "Rule 2-100 of the Rules of Professional Conduct of the State Bar of California provides that a member shall not communicate with another party known to be represented without consent of the other lawyer. A 'party' includes an employee if the communication concerns acts or omissions of the employee which may bind the employer, be imputed to, or be deemed an admission of, the employer. [¶] Although the 'Discussion' notes under the Rule states that paragraph (B) of the Rule 'is intended to apply only to persons employed at the time of the communication' citing *Triple A Machine Shop, Inc.* v. *State of California* [(1989) 213 Cal.App.3d 131 (261 Cal.Rptr. 493)], that case does not stand for that

---

[3]It is unclear why the parties focus on what Fleites may or may not have told Zora Cadovec; according to the portions of Cadovec's deposition testimony in our record, Cadovec communicated with Fleites in "A little of Spanish, and she [Fleites] speaks a little of English, so we more—well, I know her well that we don't have to talk much . . . ." According to Cadovec, Fleites did not say anything to her in English about burning or smelling, but Cadovec did not know the Spanish words for "burning" or "smelling." In the past, when Cadovec had problems understanding what Fleites was saying in Spanish, Fleites would point at things, but on the night of the fire, Fleites "didn't do nothing. It was no discussion other than what I said." Cadovec also testified that sometimes in the past when they did not understand each other, she would have to bring in someone that spoke Spanish in order to communicate with Fleites.

According to the opposition papers of plaintiff Insurance Company of North America, CBM had undertaken to represent its *current* employees, such as Noel Estrada and Zora Cadovec, at their depositions; there is no dispute that plaintiffs have not attempted to contact any current CBM employees; CBM expressly advised plaintiffs that it "did not represent former CBM employees such as Ms. Fleites." Although Fleites was employed by CBM at the time of her first deposition in 1989, she was apparently not represented by any counsel at such deposition.

proposition. Rather, *Triple A* opines that 'rule 2-100 permits opposing counsel to initiate ex parte contacts with unrepresented former employees, and present employees . . . who are not separately represented, so long as the communication does not involve the employee's act or a failure to act in connection with the matter which may bind the corporation, be imputed to it, or constitute an admission of the corporation for purposes of establishing liability.' *Triple A*. at 140. Moreover, *Triple A* does not limit such interpretation to precluding the ex parte obtaining of privileged material. The Rule is broader in concept. *Triple A* at 140-142. [¶] Plaintiffs' attorneys contact with Fleites was improper and was in violation of Rule 2-100. [¶] The motion is granted as follows: Plaintiffs and their agents, etc., and all parties on the same side as plaintiffs are prohibited from using, either directly, indirectly or on cross-examination Fleites' 1993 deposition and any non-deposition declaration or statement of Fleites. Further, said parties may not hereafter call or present Fleites as a witness at any hearing or trial."

All of the plaintiffs who had filed petitions for writ of mandate with respect to the orders involving Mr. Robleto also petitioned this court for writ of mandate seeking to vacate the August 17, 1994, order and to direct the trial court to deny CBM's motion to suppress. On September 29, 1994, we issued an order consolidating all seven petitions for all purposes and subjecting all petitions to our alternative writ of mandate issued on September 21, 1994. That alternative writ commanded respondent to vacate its orders of June 27, 1994, August 4, 1994, and August 17, 1994, imposing evidentiary sanctions, or in the alternative, show cause why a peremptory writ of mandate requiring respondent to do so should not issue. Oral argument has been had on the foregoing petitions. We proceed to address the issue of whether the trial court's orders suppressing evidence constituted abuses of discretion.

I

STANDARD OF REVIEW

■ "Our Supreme Court has recognized that California courts have inherent powers, independent of statute, derived from two distinct sources: the courts' 'equitable power derived from the historic power of equity courts' and 'supervisory or administrative powers which all courts possess to enable them to carry out their duties.'" (*Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 287 [245 Cal.Rptr. 873].) "The court's inherent power to curb abuses and promote fair process extends to the preclusion of evidence. Even without such abuses the trial court enjoys

'broad authority of the judge over the admission and exclusion of evidence.' . . . [T]rial courts regularly exercise their 'basic power to insure that all parties receive a fair trial' by precluding evidence." (*Id.* at p. 288.) "Moreover, there is no intrinsic limitation on the court's inherent power of evidence preclusion which would enable preclusion in cases of evidence destruction, but leave the court powerless to remedy other forms of litigation abuse. Peat Marwick's conduct in this case, as the trial court found, has seriously damaged the People's case. Faced with this sort of abuse of the litigation process, the trial court may act to prevent the taking of an unfair advantage and to preserve the integrity of the judicial system." (*Id.* at p. 289.)

■ The trial court's factual findings underpinning an order are binding on this court unless unsupported by substantial evidence. (*Peat, Marwick, Mitchell & Co.* v. *Superior Court, supra,* 200 Cal.App.3d at p. 277.) However, the trial court's conclusions of law are not binding on us and are reviewed de novo. (See *PJNR, Inc.* v. *Department of Real Estate* (1991) 230 Cal.App.3d 1176, 1183 [281 Cal.Rptr. 673].) The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion. (*Choice-in-Education League* v. *Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 422 [21 Cal.Rptr.2d 303].) A trial court's exercise of discretion is "subject to the limitations of the legal principles governing the subject of its action, and subject to reversal on appeal where no reasonable basis for the action is shown." (*Nalian Truck Lines, Inc.* v. *Nakano Warehouse & Transportation Corp.* (1992) 6 Cal.App.4th 1256, 1261 [8 Cal.Rptr.2d 467].)

II

ORDERS OF JUNE 27, 1994 and AUGUST 4, 1994 (ROBLETO)

■ In light of the factual findings which are set out in the trial court's June 27, 1994, order, we conclude that there is no reasonable basis for that part of the order conditioning the denial of disqualification on prohibitions against plaintiffs' use of Robleto as a witness. Attachment of such conditions to the denial of the motion thus constitutes an abuse of discretion. Quite simply, no factual or legal basis has been established on the record before us to support such conditions.

Despite the allegations in the return of real parties in interest that "petitioners have blatantly and intentionally abused the litigation process," and "the information obtained from Robleto . . . was not otherwise discoverable," no such findings expressly appear in, or arise by implication from,

the June 27 order. Real parties apparently have not sought review of the factual findings in the June 27 order or of that part of the order denying disqualification.

As we interpret the June 27 order, in light of the instant record, the court expressly *declined* to find that Goldstein violated any rule of professional conduct, or was guilty of misconduct, despite the fact that the disqualification motion asserted that Goldstein violated ABA rules 4.1 and 4.3, and that Goldstein engaged in misconduct in his dealings with Robleto. The June 27 order states: "Mr. Robleto was misled by statements of, or a failure to make relevant disclosing statements by, Mr. Goldstein." The court did *not* find that Goldstein knowingly made a false statement of material fact to Robleto (ABA rule 4.1), or that Goldstein stated to Robleto that he was disinterested or that Goldstein knew or reasonably should have known that Robleto misunderstood his (Goldstein's) role in the matter. (ABA rule 4.3; *ante*, fn. 1.) Accordingly, we need not decide the issue of whether the ABA Rules apply to California lawyers. The trial court also failed to conclude that the *content* of Robleto's statements or deposition testimony was improperly influenced by Goldstein's conduct.

The *most* we reasonably can infer from the June 27 order is that Robleto was misled as to Goldstein's role in the case and because of Robleto's misunderstanding (or confusion) as to Goldstein's role, Robleto was willing to talk to him informally about the case. Yet the court expressly found that the information Goldstein obtained from Robleto "would have developed in the case in any event," was "without any disadvantageous consequences to any party," and "Disqualifications at this stage of the case for the objected to action would serve no purpose." We conclude that substantial evidence in our record supports the foregoing findings and conclusion, which are binding on us. Real parties' assertions to the contrary are unavailing.

To the extent that real parties in interest seek to uphold the June 27 and August 4, 1994, orders on factual claims as to which the evidence was in conflict and which claims were not resolved by the trial court, we are precluded from doing so under established principles of review. (See, e.g., *Olvera* v. *Olvera* (1991) 232 Cal.App.3d 32, 39 [283 Cal.Rptr. 271]; *Rutan* v. *Summit Sports, Inc.* (1985) 173 Cal.App.3d 965, 974 [219 Cal.Rptr. 381].)

Despite the trial court's findings and conclusion that disqualification was not warranted, the trial court went on to impose conditions, in the nature of evidence preclusion orders, that are arguably more harsh and severe than disqualification in impacting plaintiffs' ability to prove their cases. Conceivably, such conditions could have been based on the trial court's implied

finding that Goldstein's ex parte communication with Robleto constituted a violation of rule 2-100. However, even if we assume to be correct the trial court's view, as set out in its August 17, 1994, order, that rule 2-100 applies to communications with former employees if the subject of the communication involves the employee's act or failure to act which may be binding upon or imputed to the corporation, or whose statement may constitute an admission of the corporation for purposes of establishing liability, we would conclude that the trial court's implied finding that Goldstein's contact with Robleto violated rule 2-100 constituted an abuse of discretion and was not supported by substantial evidence. Real parties did not contend, or offer any evidence showing, that Robleto was the type of employee falling within the provisions of the Rule as interpreted by the trial court.[4] In other words, even after the depositions of both Robleto and Goldstein, and in their arguments before us now, real parties fail to show that the communications involved any act or omission of Robleto that could be binding on CBM, that could be imputed to CBM to establish its liability in this case, or that any statement of Robleto could constitute an admission on the part of CBM.

In light of the foregoing, we conclude that there is no showing that Goldstein's ex parte communications with Robleto violated rule 2-100 as interpreted by the trial court. Moreover, neither the factual findings in the June 27 order, nor the reasonable inferences therefrom, are sufficient to support a conclusion that the instant evidence preclusion conditions were imposed to prevent an unfair advantage or to promote fair process. Thus, our record fails to show any reasonable basis for the challenged portions of the orders of June 27, 1994, and August 4, 1994. Accordingly, those portions of the orders imposing such conditions on the denial of the motion to disqualify Goldstein and his law firm constitute abuses of discretion and must be vacated.

### III

### ORDER OF AUGUST 17, 1994 (FLEITES)

The order of August 17, 1994, prohibiting plaintiffs from calling Fleites as a witness at any hearing or trial, is premised on the court's conclusion that

---

[4]As is explained in more detail below, the trial court's interpretation of rule 2-100 was in fact *incorrect* and we do not intend to imply otherwise. Our only purpose in assuming the correctness of the trial court's interpretation of rule 2-100 here is to make the argument that even under such an *incorrect* view of the rule, the conditions imposed by the June 27 and August 4 orders constitute an abuse of discretion warranting reversal. Moreover, our discussion of the proper interpretation of rule 2-100 in connection with the August 17, 1994, order involving Fleites, in the next part of this opinion, is also pertinent to the June 27 and August 4, 1994, orders. Our discussion in part III affords another basis on which to conclude the Robleto orders constitute abuses of discretion.

"Plaintiffs' attorneys contact with Fleites was improper and was in violation of Rule 2-100." The trial court interpreted paragraph (B)(2) of rule 2-100 (*ante*, fn. 2) to include a former employee whose act or omission in connection with the subject of the litigation may be imputed to CBM, and that Fleites was such an employee. None of the parties challenge the sufficiency of the evidence to support the trial court's implied finding that the plaintiffs in this case were asserting theories of liability against CBM which sought to impute Fleites's acts or omissions to CBM for purposes of establishing CBM's liability, so this aspect of the rule is not in dispute, and we express no opinion on this issue. ▮ The issue in dispute, and which we must resolve, is whether the trial court properly interpreted paragraph (B)(2) of rule 2-100 to apply to *former* employees of a corporate party represented by counsel.[5] Petitioners contend that the trial court misinterpreted *Triple A* and rule 2-100, "notwithstanding the plain language of rule 2-100, the drafter's comments, and case law affirming the right to contact former employees . . . ."

Our research has disclosed that among those jurisdictions that follow ABA rule 4.2 (*ante*, fn. 2), or a rule functionally identical to that rule (see, e.g., *Strawser* v. *Exxon Co., U.S.A.* (Wyo. 1992) 843 P.2d 613, 617, fn. 5 [843 P.2d 613]), there exists a "multifarious split in authority across the country" (*id.* at p. 618), on the issue of the propriety of ex parte communication with current and former employees of a corporate party. (See also Miller & Calfo, *Ex Parte Contact with Employees and Former Employees of a Corporate Adversary: Is it Ethical?* (1987) 42 Bus. Law. 1053; Sinaiko, *Ex Parte Communication and the Corporate Adversary: A New Approach* (1991) 66 N.Y.U. L.Rev. 1456.)

[5]We recognize that the ultimate responsibility for determining whether an attorney's conduct violates the California Rules of Professional Conduct and warrants discipline rests with the Board of Governors of the State Bar of California (Rules Prof. Conduct, rule 1-100 (A)), and that the Rules of Professional Conduct "are not intended to create new civil causes of action," or "to create, augment, diminish, or eliminate any substantive legal duty of lawyers or the non-disciplinary consequences of violating such a duty." (Rules Prof. Conduct, rule 1-100 (A).) Accordingly, our discussion is not intended to address the issue of whether there has been "a willful breach" of rule 2-100 so as to warrant discipline by the Board of Governors. (See Rules Prof. Conduct, rule 1-100 (A).) Moreover, mindful of the fact that "the 'business' of the court is to dispose of 'litigation' and not to oversee the ethics of those that practice before it unless the behavior 'taints' the trial" (*Monsanto Co.* v. *Aetna Cas. & Sur. Co.* (Del. 1990) 593 A.2d 1013, 1020), we question whether a protective or suppression order is warranted by showing *only* a violation of rule 2-100, without an additional showing that the violation led to the disclosure of confidential communications protected by the attorney-client privilege (see *Triple A Machine Shop, Inc.* v. *State of California* (1989) 213 Cal.App.3d 131, 144 [261 Cal.Rptr. 493]), or created an unfair advantage, or impacted the fairness of the trial or the integrity of the judicial system. (See *Mills Land & Water Co.* v. *Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 126, 137 [230 Cal.Rptr. 461].) We need not resolve this latter issue here, because we conclude that the trial court in the instant case erred in finding that petitioners' attorneys violated rule 2-100 in interviewing Fleites.

Although the issue of the propriety of ex parte contact with *former* employees of a corporate adversary may be unsettled in other jurisdictions, the pertinent California authorities have been remarkably consistent, to the extent that they have addressed this issue. However, the same cannot be said about the status of the rule with respect to current corporate employees. We briefly set out the development of the rule in California, in the context of the nationwide debate on the issue; such context helps to resolve the issue of the correct interpretation of rule 2-100.

Although not addressing the issue of contact with *former* employees of a party, the California Supreme Court in *Mitton v. State Bar* (1969) 71 Cal.2d 525 [78 Cal.Rptr. 649, 455 P.2d 753], articulated the policy underpinning former rule 12 of the Rules of Professional Conduct, which read in part: " 'A member of the State Bar shall not communicate with a party represented by counsel upon a subject of controversy, in the absence and without the consent of such counsel.' " (71 Cal.2d at p. 534.) "This rule is necessary to the preservation of the attorney-client relationship and the proper functioning of the administration of justice . . . . It shields the opposing party not only from an attorney's approaches which are intentionally improper, but, in addition, from approaches which are well intended but misguided. [¶] The rule was designed to permit an attorney to function adequately in his proper role and to prevent the opposing attorney from impeding his performance in such role. If a party's counsel is present when an opposing attorney communicates with a party, counsel can easily correct any element of error in the communication or correct the effect of the communication by calling attention to counteracting elements which may exist. Consequently, before any direct communication is made with the opposing party, consent of the opposing attorney is required." (*Ibid.*)

■ As noted by one commentator, the *Mitton* case acknowledges that one of the reasons for the ethical rule barring ex parte communication is to prevent injurious disclosures: "Thus, an important reason why the ethical rules bar ex parte communication is because statements made by the uncounseled party to an opposing attorney might be offered against that party as admissions in court, thereby seriously damaging [the] case. . . . '[T]he lawyer may be required to supervise the manner in which information is elicited to prevent his client from making statements which, through ambiguous use of language, may not accurately or fairly reflect the client's position.' Presence of the attorney at the interview allows counsel to perform properly her duty to ensure that her client's case is presented in the best possible light. [¶] Although these types of improvident disclosures may injure a corporation just as they may injure an individual, courts and

commentators disagree as to the scope of the prohibition on ex parte contact with corporate employees justified by such dangers." (Sinaiko, *Ex Parte Communication and the Corporate Adversary: A New Approach, supra,* 66 N.Y.U. L.Rev. 1456, 1471-1472; fns. omitted; hereinafter Sinaiko.)

"In our adversarial legal system, a policy conflict arises when a corporation attempts to use [ABA Model Code Prof. Responsibility, DR 7-104(A)(1); substantially identical to ABA rule 4.2] defensively so as to prevent an adverse attorney from interviewing its employees ex parte. On the one hand, there is the need of the adverse attorney for information which may be in the exclusive possession of the corporation and may be too expensive or impractical to collect through formal discovery. On the other hand is the corporation's need to protect itself for the traditional reasons justifying the rule." (*Wright By Wright* v. *Group Health Hosp.* (1984) 103 Wn.2d 192 [691 P.2d 564, 568, 50 A.L.R.4th 641].)

Turning to California authorities dealing with the foregoing issues, we note that in Formal Opinion No. 369 issued on November 23, 1977, by a committee of the Los Angeles County Bar Association, the committee interpreted former rule 7-103 of the Rules of Professional Conduct (former rule 7-103), a successor to the rule discussed in *Mitton,* and the predecessor to rule 2-100. The committee found "nothing unethical in an attorney interviewing a nonmanagement employee of an adverse party who may be a witness without the consent of that party's attorney," the relevant test being "the extent to which the employees are 'closely identified with management of the company." (See Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 369 (Nov. 23, 1977) p. 69 (Formal Opinion No. 369).)

In Formal Opinion No. 369, the issue was also presented as to "whether the prohibitions of the rule should be extended to encompass former 'controlling' employees. The Committee recognizes that certain ethical dangers may be posed if the rule is not extended. For example, . . . employees of the company . . . may have received, or had access to, confidential information regarding the company, and probably still have a fiduciary duty to the company not to disclose such confidential information. The rule which prohibits direct communications with an adverse party represented by counsel might be easily evaded if it were held to be inapplicable in this situation. [¶] The Committee has found no authority, however, which supports the extension of Rule 7-103 to include former employees. Moreover, application of the rule as extended would be difficult without guidelines as to how long

a 'controlling' employee would be shielded by the rule after his or her resignation. . . . [¶] . . . The attorney may not communicate, therefore, with present 'controlling' employees without the consent of opposing counsel. *He may communicate, however, with former employees without the consent of counsel for the opposing party.*" (Formal Opn. No. 369 at p. 70, italics added.)

A year earlier, in its Informal Opinion No. 1976-1, the committee of the Los Angeles County Bar Association found that it was proper for an adverse party through its lawyer or investigator to interview a "non-management" employee of a corporation represented by counsel. (Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 410 (Mar. 24, 1983) p. 114 (Formal Opinion No. 410).)

Thus, from 1976 until 1983, the foregoing ethics opinions provided persuasive guidance on the issue of the scope of permissible ex parte contacts with current and former corporate employees. (See Rules Prof. Conduct, rule 1-100 (A): "Although not binding, opinions of ethics committees in California should be consulted by members for guidance on proper professional conduct. Ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered.") During this time, former rule 7-103 was apparently interpreted according to the "control group" test, which "places more importance on broad access to information than on protecting corporate parties," but which had been criticized as "providing inadequate protection to the attorney-client privilege." (Sinaiko, *supra*, 66 N.Y.U. L.Rev. 1456, 1483.)

However in 1983 and 1984, the Ethics Committees of the Los Angeles County and the San Diego Bar Associations issued revised opinions in response to *Upjohn Co.* v. *United States* (1981) 449 U.S. 383, 390 [66 L.Ed.2d 584, 592, 101 S.Ct. 677], which case recognized that the corporate attorney-client privilege extends not only to communications between corporate counsel and members of the control group, but also to communications with middle and low level corporate employees. (Sinaiko, *supra*, 66 N.Y.U. L.Rev. 1456, 1473.)

Formal Opinion No. 410 of the Los Angeles County Bar Association acknowledged that "Although *Upjohn* is not controlling, it is certainly instructive as to whether or not the control group test should be rejected in determining which employees constitute the 'corporate party.' Its reasoning may be logically extended to ex parte contacts with a corporate party's employee by opposing counsel for at least four reasons. [¶] First, the

corporate employee may be prejudiced either directly or indirectly by the ex parte contact. Second, the corporation has an interest in seeing that information or knowledge learned by an employee in the course of the employee's employment is not released to a party with an interest inimical to the corporate employer without the protection and advice of counsel. Third, due to the difficulty of ascertaining whether an employee is acting within the scope of his or her employment, a corporate employee might be induced by opposing counsel into making admissions or statements that are binding upon the corporation. Fourth, due to the difficulty in ascertaining who is a control group member, opposing counsel might contact a party whom he believes is not a control group member, only to find out later that the person contacted was a control group member, thereby rendering the contact improper." The committee then concluded that "it is best to draw a clear and unequivocal line—opposing counsel should not have ex parte contacts concerning a subject of controversy with the employees of a corporate party to the controversy." Formal Opinion No. 410 did not address the issue of the scope of permissible ex parte contact with *former* employees.

The ethics committee of the San Diego Bar Association cited Formal Opinion No. 410 in issuing an opinion adopting a similar test under former rule 7-103 for current corporate employees; however, the San Diego committee also expressed some concerns that such a rule was overbroad: "Attention is called to the prohibition on counsel's suppression of evidence or causing a person to secrete himself or leave the jurisdiction for purposes of making him unavailable as a witness. See ABA Model Code DR 7-109(A)(B); California Rules of Professional Conduct [former rule] 7-107(A)(B) [see now rule 5-310]."

Citing Formal Opinion No. 410, but not expressly adopting its broad prohibition on ex parte contact with all current corporate employees, the court in *Mills Land & Water Co.* v. *Golden West Refining Co.* (1986) 186 Cal.App.3d 116 [230 Cal.Rptr. 461], upheld a trial court order disqualifying an attorney, Smaltz, under former rule 7-103 because of his ex parte contact with the opposing corporate party's former president, Wynn, who remained a current member of the corporation's board of directors. The court held that "an attorney may not make a unilateral decision on the application of rule 7-103 involving a corporate party. Wynn, as a Mills corporate director, came within the rule. Smaltz, at a minimum, violated the letter of rule 7-103, *at least* insofar as he failed to seek leave of court to interview Wynn without the participation of Mills' corporate counsel." (186 Cal.App.3d at p. 131.) The court thus upheld the disqualification of Smaltz personally from further participation in the litigation. However, the court concluded that the disqualification of Smaltz's entire firm was an abuse of discretion (*id.* at p. 133),

and that the trial court's blanket order suppressing "everything" obtained by Smaltz during the interview with Wynn could not stand. The court clarified and limited the scope of the suppression order to prohibit "Smaltz from discussing the interview; it cannot properly be read to require the suppression of nonprivileged information merely because it might have been initially discovered during this interview." (*Id.*, at p. 126.) Thus, "Mills was entitled to suppression until there was discovery by independent means, including ordinary discovery proceedings. [Citation.] [¶] Beyond that, we note no suppression or other similar relief was ordered in [*Chronometrics, Inc.* v. *Sysgen, Inc.* (1980) 110 Cal.App.3d 597 (168 Cal.Rptr. 196)]. [¶] This appears to be at least tacit recognition no workable solution exists in such circumstances. That is certainly the case here, where the record indicates the discussion between Wynn and Smaltz involved discoverable material or information which could not reasonably be said to have a *substantial* continuing effect on the proceedings." (186 Cal.App.3d at p. 137, italics in original.)

Although *Mills Land* did not expressly discuss the issue of ex parte contact with *former* employees, the court suggested that Wynn's status as the corporation's former president had no bearing on the issue of Smaltz's violation of former rule 7-103: "[W]e conclude Smaltz's contact with Wynn was improper. At least it was wrong, as we shall discuss, without first obtaining a court order so any contact, if permitted, could accommodate Wynn's dual role as a pivotal witness and an ongoing director." (186 Cal.App.3d at p. 126.)[6]

The issue of the application of former rule 7-103 to former employees, left undecided by the court in *Mills Land*, was addressed by the court in *Bobele* v. *Superior Court* (1988) 199 Cal.App.3d 708 [245 Cal.Rptr. 144]. Finding that the "ultimate purpose of rule 7-103 is to preserve the confidentiality of

---

[6]Although the court in *Mills Land* appeared to approve of the adoption of a clear and unequivocal bright line test, and of the broad test set out in Formal Opinion No. 410, which included all current employees, it is unclear why the court faulted Smaltz for failing "to seek leave of court to interview Wynn without the participation of Mill's corporate counsel." (186 Cal.App.3d at p. 131.) It is unclear why counsel, under a bright line test, would need to resort to the court for direction before contacting corporate employees, unless the "control group" test is applicable and an attorney is seeking a judicial determination of whether a particular individual falls within that group. As Wynn was clearly a member of the control group, it was unnecessary for the court in *Mills Land* to rely upon the broader test enunciated in Formal Opinion No. 410. Moreover, we disagree with any suggestion in *Mills Land* that a court could give prior approval of, or authorize, ex parte contact which is improper under the rule and statutory and decisional law; we also disagree with any inference that if court approval for improper ex parte communication is given, the ruling would have any impact on the disciplinary authority of the Board of Governors of the State Bar.

attorney-client communications" (*id.* at p. 712), the court in *Bobele* held that "the prohibition against ex parte contact with a 'party represented by counsel' does not extend to former employees of a corporation who were not and are not members of the corporation's 'control group.'" (*Id.* at p. 713.) A control group was defined as those officers and agents responsible for directing the company's actions in response to legal advice. (*Id.* at p. 712.) Rather, employees who are not members of the control group, "are third-party witnesses who, as the respondent court correctly stated, are 'fair game' for opposing counsel. They are not sufficiently identified with the corporation to be considered 'parties represented by counsel,' and they are less likely than current employees to be privy to privileged communications. The corporation cannot bring former employees back into the fold for purposes of a lawsuit merely because there is a risk that the former employee might disclose unfavorable facts. The attorney-client privilege 'only protects disclosure of communications; it does not protect disclosure of underlying facts by those who communicated with the attorney.'" (199 Cal.App.3d at pp. 713-714.)

The court in *Bobele* also concluded that "With respect to former employees who are not currently members of Hilton's 'control group,' the minimal risk that privileged communications will be disclosed does not justify the restrictions which the respondent court placed upon plaintiffs" (199 Cal.App.3d at p. 714), and "Presumably, Hilton knows the identities of its former employees, including those who may be parties to privileged communications, and may seek a protective order with respect to those individuals." (*Ibid.*)

As noted by one commentator, "The *Bobele* holding, however, is not a model of clarity. . . . By implication, it would appear from that statement [of its holding at 199 Cal.App.3d at 713] that the prohibition *does* extend to former employees who *were* members of the control group. Yet the court states in its conclusion that plaintiffs may contact ex parte former employees 'whether or not they were managerial employees.' 199 Cal.App.3d at 714 . . . . The court also states that its conclusion is consistent with the State Bar of California's proposed revisions to the Rules of Professional Conduct, which omit former employees from those considered 'parties' for purposes of the rule. . . . 199 Cal.App.3d at 714, fn. 1 . . . . Despite the confusing language at 199 Cal.App.3d at 713, . . . it appears that the prohibition *does not* extend to former employees who were members of the control group." (Schwartz, *Ex Parte Contacts of Current and Former Employees of the Corporate Defendant* (Cont.Ed.Bar 1988) 10 Civ. Litigation Rptr. No. 4, p. 161, original italics.)

On May 27, 1989, former rule 7-103 was replaced by rule 2-100. (*Triple A Machine Shop, Inc.* v. *State of California, supra,* 213 Cal.App.3d 131, 138, fn. 4.) "The 'Drafter's Notes' [accompanying rule 2-100] provide: 'Paragraph (B) is intended to apply only to persons employed at the time of the communication.' Thus, rule 2-100 permits opposing counsel to initiate ex parte contacts with unrepresented former employees, and present employees (other than officers, directors or managing agents) who are not separately represented, so long as the communication does not involve the employee's act or failure to act in connection with the matter which may bind the corporation, be imputed to it, or constitute an admission of the corporation for purposes of establishing liability." (*Id.,* at p. 140.)

When the language of *Triple A* is viewed in the context of the historical development and interpretation of rules governing ex parte contact, it is clear that the trial court misread that opinion in its August 17, 1994, order. When properly read, the qualifying language beginning with the phrase "so long as," which sets out the nature of the communication, was intended to modify only that part of the sentence pertaining to "present employees," and has no application to former employees. The trial court's interpretation of *Triple A* was inconsistent with prior authorities in California and with the rule which was developing in the majority of other jurisdictions.

In 1991, the American Bar Association issued Formal Ethics Opinion No. 91-359, wherein the ethics committee of the American Bar Association acknowledged recent authorities interpreting ABA Rule 4.2 to cover some former employees and one case which interpreted the rule to cover *all* former employees. (See *Public Serv. Elec. & Gas* v. *Associated Elec. & Gas* (D.N.J. 1990) 745 F.Supp. 1037.) The American Bar Association noted that "Commentators on the subject of ex parte contacts with former employees have likewise urged application of the prohibition on contacts to at least some former corporate employees. . . . [¶] While the Committee recognizes that persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover some former corporate employees, the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the Rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation." (ABA Committee on Prof. Ethics, opn. No. 91-359 (1991) p. 4.)

In 1992, addressing the issue of whether it was proper "for an attorney to communicate ex parte with a former member of a corporate adversary's

'control group,' " the court in *Nalian Truck Lines, Inc.* v. *Nakano Warehouse & Transportation Corp., supra,* 6 Cal.App.4th 1256, held that "rule 2-100 of the State Bar Rules of Professional Conduct permits such communications." (*Id.* at p. 1259, fns. omitted.) The court explained its conclusion as follows: "If the drafters of rule 2-100 had intended to prohibit ex parte communications with all former and current control group employees, they would have expressed this intention in the comment." (6 Cal.App.4th at p. 1262.)

 Although the court in *Nalian Truck Lines* was concerned with paragraph (B)(1) of rule 2-100, its reasoning is equally applicable to paragraph (B)(2), which is at issue here. Accordingly, in light of the language of the rule, the drafter's comments, and prior authorities analyzing the rules in California governing ex parte contacts, we conclude that paragraph (B)(2) of rule 2-100 applies only to persons employed at the time of the communication. Had the drafters of rule 2-100 and the State Bar Board of Governors intended to include former employees in paragraph (B)(2) of rule 2-100, we believe that the drafters would have expressly so stated for the policy reasons expressed by the court in *Nalian Truck Lines*: "[W]ith regard to the ethical boundaries of an attorney's conduct, a bright line test is essential. As a practical matter, an attorney must be able to determine beforehand whether particular conduct is permissible; otherwise an attorney would be uncertain whether the rules had been violated until, as in the case at bench, he or she is disqualified. Unclear rules risk blunting an advocate's zealous representation of a client. This is not to say that privileged matter should not be protected. Rather, it is incumbent upon a party who knows that its former employees, including former control group employees, possess privileged information to seek a protective order." (6 Cal.App.4th at p. 1264.)

Thus, we believe that paragraph (B)(2) of rule 2-100 properly is construed to apply only to current employees. This narrow construction is supported by the policy that a rule whose violation could result in disqualification and possible disciplinary action should be narrowly construed when it impinges upon a lawyer's duty of zealous representation.

Our conclusion is also consistent with principles of fairness. A diligent search of California authorities in the last 20 years would have led a reasonable attorney to conclude that ex parte contact with former noncontrol group employees like Fleites did not violate rule 2-100. While a nationwide search of authorities would have revealed some federal courts which interpreted ABA rule 4.2 to apply to some former employees, "The approach of the PSE&G court [*Public Serv. Elec. & Gas* v. *Associated Elec. & Gas, supra,* 745 F.Supp. 1037] appears to be the minority view. Prior to *PSE&G*, other

federal courts relying on the commentary to Rule 4.2 had suggested that the anticontact rule might apply to some former employees of a corporation, but none drew the prohibition so broadly. Many courts, as well as a recent opinion of the American Bar Association Committee on Ethics and Professional Responsibility, have concluded that the anticontact rule does not prohibit contact with a corporation's former employees at all. Further, in *Hanntz* v. *Shiley, Inc.* [(D.N.J. 1991) 766 F.Supp 258], another New Jersey federal judge rejected *PSE&*'s approach." (Sinaiko, *supra*, 66 N.Y.U. L.Rev. 1456, 1491-1492, fns. omitted.)

We also believe that a broad or liberal interpretation of paragraph (B)(2) of rule 2-100 to apply to former employees would be inconsistent with several policy objectives affected by such rule: "Several problems inhere in an approach that prohibits ex parte communication with former employees of a corporate adversary. First, such communication with a former employee does not effect an end-run around the protections afforded by the corporate attorney-client relationship. Clearly, ex parte communication with former employees cannot improperly influence settlement because such employees have no influence over the corporation's litigation strategy or over decisions to settle. Similarly, since the former employee is not involved in the corporation's attorney-client relationship, ex parte communication cannot undermine that relationship. Additionally, because the former employee no longer is an agent of the corporation, she cannot make revelations that bind the corporation as evidentiary admissions so that the concern about improvident statements is not implicated. Second, prohibiting ex parte contact with former employees, like a blanket prohibition on such contact with present employees, unduly impedes the flow of information and unnecessarily increases the costs of litigation." (Sinaiko, *supra*, 66 N.Y.U. L.Rev. 1456, 1492-1493, fns. omitted.)

In urging that the "anticontact rule" of ABA rule 4.2 should not be extended beyond its policy bases, Sinaiko also argued that "Ideally, the anticontact rule should protect corporations only from unfair influence on settlement, damage to the corporation's attorney-client relationship, and uncounseled statements constituting binding evidentiary admissions by the corporation's employees. For the purposes of the anticontact rule, corporate employees fall into two general groups: those within and those without the corporate control group. Potential unfair influence on settlement and damage to the corporate attorney-client relationship arise only from ex parte communication with members of the control group, for only this group of corporate employees can make ultimate decisions regarding choice of counsel, implementation of counsel's advice, and settlement." (Sinaiko, *supra*, 66 N.Y.U. L.Rev. 1456, 1496-1497, fns. omitted.)

In the instant case, none of the traditional policy reasons for invocation of an "anticontact rule" exist with respect to Fleites; in fact, ex parte communication furthers other important policies. As stated by Sinaiko, "where many corporate employees potentially possess knowledge relevant to a claim against the corporation, ex parte communication would permit identification of those employees actually possessing such knowledge and would reduce the need for expensive and unnecessary formal depositions. Ex parte communication with willing lower-echelon employees also may guide counsel to other sources of information relevant to her client's claim against the corporation and would permit counsel to ascertain the employee's value as a witness for either side. Finally, ex parte communication would permit the attorney to prepare corporate employees who are to serve as friendly witnesses at trial." (Sinaiko, *supra*, 66 N.Y.U. L.Rev. 1456, 1498, fns. omitted.)

As it was undisputed that Fleites was not employed by CBM or represented by counsel at the time of the communications at issue herein, the trial court erred in concluding that plaintiffs' attorneys contact with Fleites violated rule 2-100. The order suppressing her testimony thus constituted an abuse of discretion. As indicated above, we also conclude that the Robleto orders of June 27 and August 4, 1994, constitute abuses of discretion to the extent that the orders were predicated on an implied finding that counsel for petitioners violated rule 2-100.

Having concluded that the challenged portions of all three orders before us for review must be vacated for the reasons discussed above, we do not need to address other issues raised by petitioners.[7]

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to vacate its order of August 17, 1994, and to vacate those portions of the

---

[7]Our disposition of the issues discussed herein makes it unnecessary to address the issue of whether the June 27, 1994, order was rendered in violation of principles of procedural due process, raised by petitioners in case No. B085542; whether the Robleto and Fleites orders constituted abuses of discretion on the grounds that the orders were solely punitive in nature and were not imposed to redress any harm to CBM, raised by petitioners in cases No. B086196, and B086564; whether any violation of rule 2-100 should be excused because of good faith and reasonable reliance on *Triple A* and the drafter's note to the rule; and whether all plaintiffs should be penalized "for actions of one counsel which were deemed permissible by the State Bar of California at the time the actions were taken." We also do not need to address the issue, suggested by several petitioners, that CBM's motion to suppress as to Fleites should have been denied on the ground that CBM's delay in objecting to the contacts was prejudicial to petitioners. (See, e.g., *Western Continental Operating Co.* v. *Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 763 [261 Cal.Rptr. 100].).

orders of June 27, 1994, and August 4, 1994, attaching conditions to the denial of the motion for disqualification, and to enter a new and different order denying the motion of real parties to disqualify attorney Goldstein and the law firm of Cozen & O'Connor and denying the motion of real parties to suppress the testimony of Fleites. Petitioners are entitled to costs on review.

Johnson, J., and Woods (Fred), J., concurred