[L. A. No. 29611.   In Bank.   June 30, 1969.]

PATRICK STEPHEN MURRAY MITTON, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Maximilian J. Wiza for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law in this state for a period of three months for a violation of rule 12 of the Rules of Professional Conduct (communicating with opposing party in the absence of counsel with respect to the subject of controversy). Petitioner was admitted to practice in 1954.

*Questions*: First. *Does the evidence sustain the finding of culpability on the part of petitioner?*

*Yes.*  The burden is upon one seeking a review of a recommendation of the disciplinary board to show that its findings are not supported by the evidence or that its recom-

mendation is erroneous or unlawful. (*Corn* v. *State Bar*, 68 Cal.2d 461, 462 [1] [67 Cal.Rptr. 401, 439 P.2d 313].) In the present case, the record discloses that petitioner has not sustained this burden.

The record shows that in April 1966 Nicolina Gerritsma, who resided in Holland, arrived in Escondido, California, to visit her sister, Mrs. Paula M. Vogelaar. Miss Gerritsma had a visitor's visa, which was good for only six months, and had a return plane ticket, intending to return to her job in Holland.

Mrs. Vogelaar and her husband owned a Volkswagen microbus, and on June 15, 1966, Miss Gerritsma was severely injured as a result of a fall from a temporary luggage rack affixed to the roof of the Volkswagen. At the time of the accident, the Volkswagen was being driven by Mrs. Vogelaar.

The day after the accident, Mrs. Vogelaar contacted her insurance carrier, State Farm, and a representative of the insurance company taped an interview with her. In the interview, she stated, in part, that her sister had accompanied her to a lumber company to purchase some plywood; that the plywood was placed in the luggage rack but was not tied down, and her sister, without being requested to do so by Mrs. Vogelaar, decided to climb up on the rack and ride lying on the plywood to hold it down; that she (Mrs. Vogelaar) did not think it would be dangerous; and that she drove only 20 or 25 miles an hour.

In July 1966, Miss Gerritsma's father, John Gerritsma, consulted petitioner about her injuries. Miss Gerritsma was still in a coma and was unable to communicate with anyone herself. Mr. Gerritsma, also a native of Holland, spoke with a heavy foreign accent, and petitioner had difficulty understanding him. Petitioner therefore suggested that Mr. Gerritsma return later with Mrs. Vogelaar, who could speak better English and had a firsthand knowledge of the accident.

About a week later, Mr. Gerritsma and Mrs. Vogelaar came to petitioner's office, and petitioner discussed with them the details of the accident, the extent of Miss Gerritsma's injuries, her potentially large medical bills, and her possible causes of action, including one against Mrs. Vogelaar. Mrs. Vogelaar informed petitioner that she carried liability insurance. She later took petitioner to the scene of the accident and described what had occurred.

At petitioner's suggestion, Mrs. Vogelaar subsequently had her husband drive the vehicle over the same route at 25 miles

an hour while she lay on top of the luggage rack, and she reported to petitioner the results of such test.

On petitioner's recommendation, an action was filed July 25, 1966, on behalf of Miss Gerritsma by her father, as guardian ad litem, against Mrs. Vogelaar and her husband. Petitioner had one of the secretaries in his office telephone Mrs. Vogelaar and request that she come to his office and accept service of the summons and complaint. Mrs. Vogelaar later did as requested, but petitioner was out of the office and did not see her on that occasion.

Mrs. Vogelaar took the summons and complaint· to State Farm. Her policy contained an exclusion as to members of the insured's family residing in the same household, and the insurance company initially sought to avoid the responsibility of undertaking Mrs. Vogelaar's defense, asserting that Miss Gerritsma was covered by the exclusion. Petitioner requested another attorney, Clinton F. Jones, to try to persuade the insurance company to handle Mrs. Vogelaar's defense, and on or about August 6, 1966, arrangements were made for Mrs. Vogelaar to give a statement to a State Farm adjuster in Mr. Jones' office.

In her statement given at that time, Mrs. Vogelaar stated, in substance, that although her sister was living with her at the time the accident occurred, her permanent home was in Holland, where she intended to return; that it was her sister's idea to climb on top of the vehicle to ride lying down on the plywood to keep it from blowing off; that after she left the lumber company's parking lot, she drove no faster than 25 miles an hour, she had the car radio on loud so that her sister could· hear the music, the dog was barking, her two children were making a lot of noise, the windows were down, and the traffic was noisy; that when they were 3 or 3½ miles from the lumber company, she heard a "thud" and, upon looking in her rear view mirror, saw her sister lying on the road; that if her sister had sought to attract her attention, she was unaware of such efforts; and that before the accident occurred, she did not ask if her sister was all right. At the conclusion of the statement, Mrs. Vogelaar expressed the opinion that 25 miles an hour was too fast, because after the accident she rode on top of the car with her husband driving the same route at 25 miles an hour, and she had to "hang on for dear life to keep from falling off."

Thereafter, State Farm arranged for Gene Smith, a San Diego attorney, to defend Mrs. Vogelaar but asserted a reser-

vation of rights.[1] Mr. Smith filed an answer to the complaint. Two trials were had, and Mr. Smith remained attorney of record for Mrs. Vogelaar throughout both trials and on appeal.

Between the time Mr. Smith appeared as counsel for Mrs. Vogelaar and the first trial, petitioner on at least three occasions saw or talked with her. The first time was when she came to his office and sought to see him regarding a dispute Mr. Vogelaar was having with his employer. At petitioner's request, his then law partner, Anthony Bright, came into his office while Mrs. Vogelaar was there. Thereafter, Mr. Bright took petitioner aside and urged him to have Mrs. Vogelaar leave, and petitioner apparently did so.

At the hearing before the disciplinary board, Mr. Bright at first testified, in effect, that he was concerned about the disciplinary implications of petitioner's conduct. In his later testimony, however, Mr. Bright indicated that he was concerned that the contact with Mrs. Vogelaar might prejudice the lawsuit against petitioner. He said that petitioner had previously indicated to him that it would be difficult to establish liability.

Muriel Klimuk, one of the two secretaries in petitioner's office, testified that she saw Mrs. Vogelaar come into the office on at least one or two other occasions, on one of which she heard petitioner say to Mrs. Vogelaar in the outer office area, "Gene Smith! Well he represents the insurance company." Both petitioner and Mrs. Vogelaar denied that such a conversation took place. Miss Klimuk also testified that about a week before the first trial petitioner telephoned Mrs. Vogelaar and asked if she would appear at the trial without being subpoenaed. There is no dispute with respect to this conversation.

At the time of the first trial, Miss Gerritsma was still incompetent as a result of her injuries, and Mrs. Vogelaar was the only witness as to what had occurred. The first trial resulted in a jury verdict for $95,000 in favor of Miss Gerritsma. Mr. Smith filed a motion for new trial, and petitioner moved for a new trial on damages only. Both motions were set for hearing before Judge Ruffin in January 1967.

---

[1] By letter dated August 11, 1966, State Farm called to the attention of the Vogelaars the fact that their policy contained an exclusion as to bodily injury to any member of the insured's family residing in the same household as the insured and also required that the insured cooperate and assist the company in the conduct of any legal proceedings. The letter further informed the Vogelaars that any action taken by the company to defend against a claim or in the handling of any litigation should not be construed as a waiver of its right to deny liability under the policy.

Between the conclusion of the first trial and the hearing on the motions for new trial, Mrs. Vogelaar telephoned petitioner, asking if she could send her sister back to Holland, where the sister could receive free medical care. During the course of this conversation, petitioner mentioned to Mrs. Vogelaar that a motion for new trial was pending. According to Mrs. Vogelaar, petitioner informed her in this conversation that because the judgment was over the policy limits ($25,000), she should have her own attorney to represent her at the hearing on the motion for new trial, as well as any subsequent trials. She told petitioner that Mr. Smith had never advised her she was entitled to her own attorney. She also said that the trial had made her sick and that she did not want to go through another one. Petitioner indicated that if she wanted the verdict to remain the same, she should be represented by her own attorney and that he would contact some attorneys to see if he could find someone to represent her. Thereafter, petitioner solicited five attorneys purportedly to represent Mrs. Vogelaar.

According to petitioner, the first two (including Mr. Bright) refused. Petitioner then asked Richard T. Norman, who likewise refused. He later spoke with both Mr. Norman and the latter's law partner, Clinton F. Jones, in their office and tried, unsuccessfully, for half an hour to persuade them that Mrs. Vogelaar had a legitimate position that she was not being represented by her insurance company counsel and that they had a right to speak for her along that line. Although petitioner testified it was his recollection Mrs. Vogelaar was not present when he conferred with Mr. Jones and Mr. Norman, both Mr. Jones and Mr. Norman testified that she was present. Finally petitioner contacted Daniel Cronin, another attorney, who, after talking with petitioner in person, agreed to appear at the hearing and speak for Mrs. Vogelaar.

In seeking to persuade the various attorneys to appear for Mrs. Vogelaar and oppose the motions for new trial, petitioner explained that he had just recently attended a seminar at which he had heard some discussion relating to the possible liability of an insurance carrier where the carrier had refused an offer to settle within the policy limits and a judgment substantially in excess of the policy limits was thereafter obtained. He apparently argued that if a new trial could be obtained on the issue of damages alone, and he recovered a judgment of from $300,000 to $500,000 on the new trial, he would have a strong possibility of holding the insurance com-

pany for the excess in a bad faith action against the company, since he had previously offered to settle for the $25,000 policy limit. In spite of petitioner's argument, however, the general reaction of the first four attorneys with whom he discussed the matter was that to represent Mrs. Vogelaar's best interests, they would have to argue for a new trial on all issues.

When the question of a fee was raised by one of the attorneys, petitioner indicated that the fee would be a percentage of the excess recovered from the insurance company in the proposed bad faith action.

Mr. Cronin testified that petitioner came to his office the morning of the hearing day (the hearing was set for 1:30 p.m.); that it seemed to him "an unusual twist" for Mrs. Vogelaar to be opposing a motion for new trial; that he raised the point that the situation "would smell of collusion to high heaven," but that petitioner replied, "Why of course it's obvious, it is the insurance company that is doing all the defending here, and they have treated these people pretty shabbily"; that as petitioner went into the details, he "sort of agreed with him"; and that after he agreed to appear for Mrs. Vogelaar at the hearing, petitioner called his secretary and instructed her to fill in Mr. Cronin's name on the declaration he had prepared.

Later in the day, petitioner drove both Mrs. Vogelaar and Mr. Cronin to the courthouse for the hearing. During the course of the ride, he introduced Mrs. Vogelaar to Mr. Cronin and informed her that Mr. Cronin would be her attorney. He also produced the declaration, which Mr. Cronin had not seen before. Mr. Cronin and Mrs. Vogelaar then discussed the declaration, and she executed it.

Mr. Smith testified before the disciplinary board that at the time of the hearing on the motions for new trial, and before the judge appeared, petitioner, Mr. Cronin, and Mrs. Vogelaar came into the courtroom together. Mr. Cronin, whom Mr. Smith had never seen before, said to him, "This new trial, we want it stopped." He then handed Mr. Smith the declaration signed by Mrs. Vogelaar. It was designated "Declaration Opposing New Trial," showed that Mr. Cronin was acting as Mrs. Vogelaar's attorney, and stated in pertinent part: "I, Paula M. Vogelaar, declare the following facts to be true of my own knowledge and that if called as a witness in the above-entitled proceeding, I could testify competently thereto:

"1. For the period including June 15, 1966, I was a named insured in a policy of automobile insurance with State Farm

Insurance with limits of liability of $25,000.00 for bodily injury to one person.

"2. On or about August 11, 1966, I was notified by letter . . . that State Farm was reserving its rights to deny me coverage.

"3. I never employed Gene Smith as my attorney, he was supplied by State Farm Insurance Company.

"4. Neither Gene Smith nor anyone from State Farm ever notified me I was entitled to have my own attorney. I was always of the opinion he represented me.

"5. Mr. Smith directed me and my husband to stay out of the courtroom during the trial and we were permitted in only when testifying. I have never learned what went on in the trial.

"6. I first learned of the motion for a new trial when I called Mr. Mitton [petitioner] to ask him when we could send my sister back to Holland. The motion for a new trial is without my consent and against my wishes.

"7. I know I had the opportunity to save my sister from the accident by stopping. I took the chance of injuring her and knew she was in danger.

"8. I might, over the years, be able to pay the judgment as it now stands, but I could never even try to pay a judgment of $300,000.00 or more. For this reason and for the reason my sister will be able to get free medical care in Holland, I don't want a new trial at all."

Mr. Smith testified that when Judge Ruffin came in at the time the motions for new trial were set for hearing, the clerk called the declaration to his attention. Judge Ruffin, after reading the declaration, ruled that Mr. Smith was attorney of record and that the court could not accept or consider the declaration. He then questioned Mr. Cronin regarding the preparation of the document and asked him when he had first been contacted in the matter. Mr. Cronin indicated that petitioner had contacted him the morning of the hearing. The defendant's motion for a new trial was granted, and Judge Ruffin thereafter called the foregoing incident to the attention of the State Bar.

At the second trial, the trial court, sitting without a jury, granted the defendant's motion for a judgment of nonsuit upon completion of the plaintiff's presentation of evidence. Upon appeal, the judgment was affirmed on the ground that plaintiff was guilty of contributory negligence and the doc-

trine of last clear chance was inapplicable. (*Gerritsma* v. *Vogelaar*, 266 Cal.App.2d 210 [72 Cal.Rptr. 89].)

The record shows that Mr. Smith did not, prior to the first trial, advise Mrs. Vogelaar of the possible conflict of interest between the insurance carrier and her with respect to a judgment in excess of her insurance coverage. However, he took the position that she had no liability, and this position was sustained after the first trial by the granting of his motion for a new trial and at the second trial by the granting of his motion for nonsuit (later sustained on appeal).

More importantly, the record shows that petitioner seized on defense counsel's failure to advise the insured respecting her potential liability for damages in excess of her insurance coverage in an attempt to gain an advantage in the lawsuit. In the declaration signed by Mrs. Vogelaar, it will be recalled, she made statements admitting that she knew her sister was in danger and that she nevertheless failed to act to prevent injuring her. Such an admission was against Mrs. Vogelaar's legal interests and was clearly designed to strengthen petitioner's client's case on the liability issue.

Furthermore, Mrs. Vogelaar was obligated to cooperate with and assist defense counsel, but by cooperating with petitioner, she breached such duty owing by her to the insurance company, thus subjecting herself to possible personal liability for the whole judgment. It does not appear that petitioner explained this to her, although he took advantage of her willingness to rely on him and oppose the motion for a new trial filed by her own counsel.

Petitioner argues that it was in Mrs. Vogelaar's interest for her sister to recover judgment against her and the insurance company. The lawsuit, however, involved Mrs. Vogelaar's legal rights and duties, and petitioner's actions prevented her counsel from properly advising her regarding these matters. Additionally, it appears that petitioner was not actually trying to assist Mrs. Vogelaar, but was, rather, trying to preserve his client's verdict, which was then under attack by his opponent.

Petitioner's claim that he sought independent counsel to assist Mrs. Vogelaar is not supported by the record. What the record shows is that he sought to engage an attorney not to act as independent counsel for Mrs. Vogelaar, but to carry out a role he had devised to assure that a judgment against her

would stand, hopefully in an amount substantially larger than the one obtained at the first trial.[2]

Rule 12 of the Rules of Professional Conduct reads in pertinent part: "A member of the State Bar shall not communicate with a party represented by counsel upon a subject of controversy, in the absence and without the consent of such counsel." ▉ This rule is necessary to the preservation of the attorney-client relationship and the proper functioning of the administration of justice and was designed to prevent acts such as those engaged in here by petitioner. It shields the opposing party not only from an attorney's approaches which are intentionally improper, but, in addition, from approaches which are well intended but misguided.

▉ The rule was designed to permit an attorney to function adequately in his proper role and to prevent the opposing attorney from impeding his performance in such role. If a party's counsel is present when an opposing attorney communicates with a party, counsel can easily correct any element of error in the communication or correct the effect of the communication by calling attention to counteracting elements which may exist. Consequently, before any direct communication is made with the opposing party, consent of the opposing attorney is required.

▉ Under the facts of this case, petitioner was clearly guilty of a violation of rule 12.

[2]Mr. Norman testified, in part: "The substance was that my representation of her [Mrs. Vogelaar] would be such that would bring about a large verdict for the plaintiff. . . . And he said, well, he wanted me to represent her not for the purpose of having a new trial, but if there was to be one granted, only on damages, not based on liability. . . . I think basically the discussion was directed toward eliciting an opinion from me as to how a person representing Mrs. Vogelaar could argue the lawsuit such that it would tend to bring about a more favorable verdict to the plaintiff."

Mr. Jones testified, in part: "He [petitioner] stated . . . that he felt that the insurance carrier's activities in this matter were such that if he could get a favorable judgment on behalf of the plaintiff in a retrial in excess of coverage—and as I remember it, there was only $25,000 coverage in this case—that if he could get a favorable judgment in excess of the . . . policy limits, not only would the insurance company have to pick up the tab for the excess, but he felt that they would be subject to a judgment for punitive damages. He wanted me to appear in court and represent the defendant, Mrs. Vogelaar, at the time of the motion for new trial. . . . He wanted me to protect her interests. But then he stated he wanted me to argue that the motion for new trial should be granted, but only on the item of damages. And I stated I didn't think that I would be representing the defendant Vogelaar's interest if I took that position. It sounded to me like I would be representing the plaintiff's interests."

■ Second. *Is the degree of discipline appropriate under the circumstances?*

*Yes.* Petitioner's conduct alone justifies the discipline imposed. In addition, however, in recommending a three months' suspension, the disciplinary board considered two prior disciplinary proceedings against petitioner, each involving his wilful violation of rule 2 of the Rules of Professional Conduct (solicitation). The discipline in each matter was imposed in 1958. In one proceeding, this court suspended petitioner for three months (*Mitton* v. *State Bar*, 49 Cal.2d 686 [321 P.2d 13]); in the other he was privately reproved by the Board of Governors.

While each disciplinary case must turn on its own facts, it should be noted that in *Turner* v. *State Bar*, 36 Cal.2d 155 [222 P.2d 857], and *Carpenter* v. *State Bar*, 210 Cal. 520 [292 P. 450], both of which likewise involved violations of rule 12, three months' suspensions were imposed.

It is ordered that petitioner be suspended from the practice of law for a period of three months, the order to become effective 30 days after the filing of this opinion.