## Tammy Baisley, et al. v. Missisquoi Cemetery Association & Robert Young, Sr.

[708 A.2d 924]

No. 96-433

Present: Amestoy, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed January 23, 1998

Motion for Reargument Denied March 24, 1998

*Timothy J. Ryan* of *Brown, Cahill, Gawne & Miller*, St. Albans, for Plaintiffs-Appellants.

*Duncan Frey Kilmartin* of *Rexford & Kilmartin*, Newport, for Defendants-Appellees.

**Dooley, J.** This wrongful death action was brought by the family and estate of Craig Baisley, a five-year-old boy who fell from a tree onto a metal spike fence, incurring injuries that resulted in his death. The trial court granted summary judgment in favor of defendants Missisquoi Cemetery Association (MCA) and its president, Robert Young, Sr., concluding that Craig was a trespasser to whom defendants owed no duty of care. On appeal, plaintiffs contend that the trial court erred in (1) holding that defendants owed no duty of care to plaintiffs' decedent, (2) denying partial summary judgment to plaintiffs on defendants' affirmative defenses, (3) refusing to compel discovery of a statement by defendants' sole employee against a claim of attorney-client privilege, and (4) barring plaintiffs from interviewing defendants' sole employee outside the presence of defendants' counsel. We hold that defendants owed a duty of ordinary care to decedent, reverse the order of summary judgment on that issue, and do not reach the availability of defendants' defenses. We affirm the orders denying discovery and the opportunity to interview defendants' employee without the presence of counsel.

On the afternoon of October 22, 1991, five-year-old Craig Baisley followed his brother Jeffrey, Jr. and his friend Chris, both nine years

old, to play in and around a nearby cemetery owned by MCA. The two older boys were working on a ground fort north of the cemetery on the other side of some railroad tracks. While working on the ground fort, they noticed the remnants of a tree house inside the cemetery. After entering the cemetery and examining the tree house, they decided to build their own tree house in another tree. They obtained a hammer from home and a ladder, which was lying in the railroad right-of-way north of the cemetery, apparently abandoned. They chose a tree that stood immediately outside the cemetery, on land owned by neighbors Richard and Shelba Prive.

Between the cemetery grounds and the tree ran a metal fence along the boundary of the cemetery land. The vertical bars of the fence were pointed, or "spiked." The boys approached the fence and tree from inside the cemetery and placed the ladder over the fence and against the tree, enabling them to climb into the tree branches. The tree branch on which Craig was standing broke, and he fell onto the spikes of the metal fence impaling himself. He died shortly thereafter because of puncture wounds to his heart and lungs.

Plaintiffs brought suit against MCA, its president, and the Prives, alleging defendants were negligent in allowing the hazardous condition caused by the tree and the fence. The Prives eventually settled and were dismissed. The remaining defendants moved for summary judgment, and the superior court granted the motion, holding that defendants owed decedent no duty of care because decedent was a trespasser on cemetery association land. Plaintiffs' challenge to this holding is the main issue in this appeal. Plaintiffs also ask us to rule that the affirmative defenses defendants have pled are not available, and grant plaintiffs partial summary judgment striking these defenses.

Two other issues arose in discovery. Plaintiffs deposed the caretaker of the cemetery, Raymond Revoir, who is MCA's sole employee. Revoir testified that he had worked for the cemetery association for fifteen years. He stated that he had previously seen children playing in the cemetery and had told them to go home, that he had seen remnants of an old tree house in the cemetery, and that he had seen a ladder on the railroad right-of-way several days before the accident. Plaintiffs' attorney asked Revoir if he had spoken with defendants' attorney about the accident, to which Revoir answered affirmatively. Defendants' attorney then asserted attorney-client privilege over the conversation between him and Revoir. Plaintiffs moved for an order directing Revoir to answer the question, but the court ruled that the

communication between Revoir and defendants' counsel was covered by MCA's attorney-client privilege. Plaintiffs also moved to allow their counsel to interview Revoir outside the presence of defendants' counsel, but the court denied this motion on the basis that such an interview would be unethical.

## I.

■ Plaintiffs claim that the trial court erred in granting summary judgment to defendants based on its conclusion that decedent was an undiscovered trespasser to whom defendants owed no duty of care. Summary judgment is appropriate only where, taking the allegations of the nonmoving party as true, it is evident that there exist no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See *Zukatis v. Perry*, 165 Vt. 298, 300, 682 A.2d 964, 965 (1996).

■ To prove negligence, plaintiffs must show a duty of care on the part of defendants, failure to perform that duty, and injury resulting from the breach of that duty. See *id.* at 301, 682 A.2d at 966. The trial court held that defendants owed no duty of care to plaintiffs because Craig was a trespasser and granted defendants' motion for summary judgment on that basis. In order to reverse the trial court, we must conclude that (1) defendants owed a duty of care to plaintiffs, and (2) plaintiffs' allegations make out a breach of that duty.

■ In Vermont, a landowner generally owes no duty of care to a trespasser, except to avoid willful or wanton misconduct. See *Buzzell v. Jones*, 151 Vt. 4, 6, 556 A.2d 106, 108 (1989); *Hillier v. Noble*, 142 Vt. 552, 556, 458 A.2d 1101, 1103 (1983). We have not adopted the doctrine of attractive nuisance, so the absence of duty applies to both adult and child trespassers. See *Zukatis*, 165 Vt. at 300-01, 682 A.2d at 965-66. Plaintiffs urge us to abandon this status-based approach to landowner liability, see *id.* at 305, 682 A.2d at 968 (Dooley, J., dissenting) ("our law on landowner liability is in serious need of reexamination"), and the parties have briefed the wisdom of our traditional rule in detail, drawing on the many precedents from other states. Because of the unique facts of this case, however, we need not address the vitality of our landowner-liability rules.

Although Craig Baisley trespassed on the cemetery land to reach the ladder, he used the ladder to climb into the branches of a tree that is outside the cemetery on land belonging to the Prives. While in the tree, he may have been a trespasser on Prive property, but that status

is irrelevant to defendants' duty of care. See *Humphrey v. Twin State Gas & Elec. Co.*, 100 Vt. 414, 418, 139 A. 440, 442 (1927). If he ever again became a trespasser with respect to defendants, it was when he fell on the fence and became impaled. The question before us, then, is whether contact with a property boundary fence is a trespass such that the owner of the fence has no duty of care to avoid injury from the contact. At least as we have phrased the question, it appears to be one of first impression.

We note that the general statement of the no-duty-to-trespassers rule does not appear to encompass this circumstance. Thus, the Restatement defines a trespasser as one "who *enters* or remains upon land in the possession of another" without consent or other privilege. Restatement (Second) of Torts § 329 (1965) (emphasis supplied). Although the touching of the fence may be said to be a technical entry, the real purpose of the fence is to prevent entry onto the land.

We prefer to analyze the circumstance in relation to the reasons for the no-duty rule. A number have been advanced: (1) the presence of a trespasser on the land is not foreseeable, see *Trudo v. Lazarus*, 116 Vt. 221, 224-25, 73 A.2d 306, 308 (1950); (2) a duty of care would impose an unreasonable burden on the use of land, see F. James, Jr., *Tort Liability of Occupiers of Land: Duties Owed to Trespassers*, 63 Yale L.J. 144, 151 (1953); and (3) the trespasser is a wrongdoer, see *id.* at 152; W. Keeton, et al., Prosser & Keeton on the Law of Torts § 58, at 394 (5th ed. 1984). To the extent these reasons exist at all, they are greatly attenuated for a property boundary fence. The fence is the landowner's face to the public and the users of adjoining lands. It is hardly unexpectable that the fence will be touched; indeed, the point of the fence is to allow contact to avoid an accidental entry onto the land. If the person who touches a boundary fence is a trespasser, it is only in the most technical sense. The burden of making a boundary fence safe is not unreasonable. See *Barr v. Green*, 104 N.E. 619, 620 (N.Y. 1914).

■ Probably for these reasons, virtually all courts which have considered tort liability cases involving a boundary fence have analyzed the landowner's conduct under a duty of ordinary care, the duty applicable to a person who is on abutting land. See *Butterfield v. Community Light & Power Co.*, 115 Vt. 23, 25, 49 A.2d 415, 416 (1946) (adopting prudent-person standard for abutters). Thus, the New York Court of Appeals held in an early case that "[w]hether a person is liable for injuries arising from the erection of a fence depends upon the ordinary principles . . . as to what constitutes negligence." *Barr,*

104 N.E. at 620. In *Barr*, the defendant erected a barbed-wire fence between his property and an adjoining schoolyard. An eleven-year-old girl inadvertently ran into the fence, from which she received lacerations on her neck. The court reversed summary judgment, holding that the defendant could be held liable for negligence in erecting the fence. See *id.*; see also *Marton v. Jones*, 186 P. 410, 411 (Cal. Ct. App. 1919) (negligence of defendant in maintaining barbed-wire fence next to sidewalk gives rise to liability to pedestrian who slipped on sidewalk and grabbed fence); *Skaling v. Sheedy,* 126 A. 721, 722 (Conn. 1924) (allowing negligence action where seven-year-old child was injured when she fell off sled and into barbed-wire boundary fence); *Cincinnati & H. Spring Co. v. Brown*, 69 N.E. 197, 198 (Ind. Ct. App. 1903) (where child ran into defendant's barbed-wire boundary fence while playing, jury could find that defendant was negligent and find liability); *Bennett v. Kelly*, 19 A. 69, 70 (Pa. 1890) (analyzing on negligence principles case in which plaintiff slipped on sidewalk and grabbed defendant's fence for balance, injuring hand on spike); *Sheets v. Burleson*, 488 S.W.2d 365, 366 (Tenn. 1972) (on similar facts, follows *Bennett v. Kelly*). But see *Legg v. Blanchfield*, 841 P.2d 662, 663-64 (Or. Ct. App. 1992) (where child jumped on top of wooden fence, which gave way because of force of contact, child was trespasser and could recover, if at all, only under doctrine of attractive nuisance).[1] Without considering whether to modify our

---

[1] In three other categories of cases, courts have found a duty without addressing the issue before us. In one category, the courts found that the result would be the same whatever the relevant standard of care. See *Jones v. Hernandez*, 263 N.E.2d 759, 764 (Ind. Ct. App. 1970) (whatever plaintiff's status, liability attaches when defendant's fence has been connected to 110 volt electric outlet and plaintiff contacts it); *Noyes v. Carr*, 117 N.E. 350, 351 (Mass. 1917) (no liability where pedestrian injured hand when she slipped on sidewalk and grabbed defendant's fence).

In another, the plaintiff was not considered a trespasser because the contact was inadvertent. See *Ryder v. Robinson*, 107 N.E.2d 803, 804-05 (Mass. 1952) (where fence fell on plaintiff child after being struck with rock, jury could believe contact with fence was inadvertent and not a trespass); *Paine v. Hampton Beach Improvement Co.*, 100 A.2d 906, 910 (N.H. 1953) (where plaintiff fell down on defendant's land on drop-off next to public sidewalk, plaintiff would not be considered trespasser because entry onto defendant's land was involuntary or accidental). These decisions do not help plaintiffs in this case because, following the Restatement rule, we have held that a person is a trespasser even if the entry on land was inadvertent. See *Trudo v. Lazarus*, 116 Vt. 221, 224, 73 A.2d 306, 308 (1950); Restatement (Second) of Torts § 329, cmt. c. (1965).

In the third, an applicable statute provided the duty. See *Durgin v. Kennett*, 29 A. 414, 414 (N.H. 1893). In *Durgin*, the fence statute required an owner of adjoining lands to build and keep in repair a partition fence and specified that the landowner would be liable for damages arising from neglect of this duty. We have a similar statute, see 24 V.S.A. § 3808, and although it is inapplicable to this case, it is a relevant legislative

landowner liability rules generally, we conclude that defendants owed Craig Baisley a duty of ordinary care.

The duty of care defendants owed was to "keep [their] property from becoming a source of danger to [those on adjoining lands] . . . by reason of any defect either in construction, use, or repair, so far as the exercise of the care of a prudent man can guard against the same." *Butterfield*, 115 Vt. at 25, 49 A.2d at 416. In applying the standard, we must consider the consequences that a prudent person might have anticipated. See *Forcier v. Grand Union Stores, Inc.*, 128 Vt. 389, 393, 264 A.2d 796, 799 (1970). We must decide whether, based on the evidence submitted in connection with the motion for summary judgment, the jury could find that defendants breached their duty.

■ Where there is no "settled . . . rule of diligence," negligence is ordinarily a question for the jury. *LaFaso v. LaFaso*, 126 Vt. 90, 96, 223 A.2d 814, 819 (1966). The requirements of the prudent person rule vary with the circumstances so each case must be decided on its own facts. See *id.* at 94, 223 A.2d at 818; see also *Lavallee v. Pratt*, 122 Vt. 90, 94, 166 A.2d 195, 198 (1960) ("Liability in negligence does not lend itself to exact definition or patterns of behavior that may have predominated at an earlier misadventure.").

A number of factors suggest that the jury could find a breach of defendants' duty in this case. The cemetery gates were open, and children were known to play in and around the cemetery. The fence spikes were dangerous to anyone who came in contact with them, yet they no longer fulfilled the purpose of keeping persons out of the cemetery. Defendants' caretaker knew of the dangerousness of the fence, the fact that the tree overhung the fence, and the presence of another tree house structure in one of the trees in the cemetery. In dealing with children, defendants' duty had to include consideration of their "inability to protect themselves, and . . . their childish indiscretions, instincts and impulses." *LaFaso*, 126 Vt. at 96, 223 A.2d at 819.

■ Based on the undisputed material facts before the court on the summary judgment motion, and the inferences that could be drawn from them in plaintiffs' favor, we conclude that a jury could find that the accident was foreseeable from the conditions known to defendants or their employee. We also conclude that a jury could find that a

policy statement about the proper burden to be placed on landowners for damages caused by fences.

prudent landowner in defendants' position should have taken precautions to avoid the accident. See *Trobiani v. Racienda*, 238 N.E.2d 177, 179 (Ill. App. Ct. 1968) (ladder over open stairwell could constitute dangerous condition as to four-year-old plaintiff); *Smith v. Springman Lumber Co.*, 191 N.E.2d 256, 258 (Ill. App. Ct. 1963) (tree and oil tank together created dangerous agency likely to cause injury to children); *Cincinnati & H. Spring Co.*, 69 N.E. at 198 (where defendant maintained ruined barbed-wire fence in area where children played, liability was properly left to jury); *Barr*, 104 N.E. at 620 (where landowner put up barbed-wire fence in area frequented by children, it was for jury to decide whether an ordinarily prudent person would have foreseen that it might cause injury through contact with it); *Schaut v. Borough of St. Mary's*, 14 A.2d 583, 585 (Pa. Super. Ct. 1940) (where pedestrian slipped on sidewalk and was impaled on stakes placed in grass of adjoining landowner, liability was for jury). The trial court erred in granting defendants summary judgment on liability.

## II.

Plaintiffs' second claim is that the trial court erred when it denied their motion for partial summary judgment on defendants' affirmative defenses of contributory negligence, assumption of risk, and efficient intervening cause. A review of the record reveals that the trial court, having granted summary judgment to defendants MCA and Young, ruled on the motion for partial summary judgment only as it applied to defendants Richard and Shelba Prive, who are no longer parties to this action. Because the court did not decide this issue as it applied to defendants MCA and Young, the matter is not properly before us, and we decline to address it.

## III.

Plaintiffs' third claim requires us to define the scope of the lawyer-client privilege in the corporate context. Plaintiffs seek to discover the contents of statements made by the cemetery caretaker and MCA's only employee, Raymond Revoir, to defendants' attorney. Defendants assert that the statements are privileged lawyer-client communications. According to defendants, the caretaker is a "representative of the client," whose communications are privileged under the Vermont Rules of Evidence. See V.R.E. 502(a)(2) (Supp. 1996) (defining "representative of the client"). We agree that the communications are privileged.

Courts have recognized the confidentiality of lawyer-client communications for centuries. See M. Waldman, *Beyond Upjohn: The Attorney-Client Privilege in the Corporate Context*, 28 Wm. & Mary L. Rev. 473, 475 (1987). In the modern era, the privilege is "seen to rest on the utilitarian theory that encouraging clients to make the fullest disclosure to their attorneys enables attorneys to act more effectively, justly, and expeditiously, and that these benefits outweigh the risks posed by barring full revelation in court." 3 Weinstein's Federal Evidence § 503.03[1], at 503-09 (J. McLaughlin ed., 2d ed. 1997); see also *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (Court recognized that purpose of privilege is to encourage clients to make full disclosure to their attorneys).

The lawyer-client privilege extends to corporations and other organizations. V.R.E. 502(a)(1) (client includes "person, public officer, or corporation, association, or other organization or entity, either public or private"). The scope of the privilege in the corporate context has, however, invoked considerable debate, "calling into question the values the privilege serves." 3 Weinstein, *supra*, § 503.03[3], at 503-11. Interpreted in its broadest sense, the attorney-client privilege would create a vast zone of silence around corporate affairs. Thus, courts have struggled to answer: who speaks for the client when the client is an organization?

As originally adopted, our lawyer-client privilege rule did not define who was to be considered a representative of a corporate client for purposes of the privilege. See Reporter's Notes, V.R.E. 502. By omitting a definition of "representative of the client," the rule adopted the approach of *Upjohn Co. v. United States*, leaving the issue to case law development. See 449 U.S. at 396-97.

Effective January 1, 1994, the Legislature enacted a lawyer-client privilege statute in order to define the representative of the client for a corporation. The statute restricts the privilege to communications with such representatives in two categories: (a) communications with a member of the corporate "control group . . ., acting in his or her official capacity"; and (b) communications with a person who is not a member of the control group "to the extent necessary to effectuate legal representation of the corporation." 12 V.S.A. § 1613. The "control group" includes (1) "officers and directors of a corporation," and (2) persons who (a) "have the authority to control or substantially participate in a decision" taken on advice of the lawyer, or (b) "have the authority to obtain professional legal services or to act on advice rendered pursuant thereto, on behalf of the corporation." *Id.*

§ 1613(1), (2). The act in which the privilege statute appears is entitled "An Act Relating to Business Corporations," and applies to corporations in existence on January 1, 1994 "that were incorporated under any general statute of this state relating to incorporation of corporations for profit" if the Legislature reserved the power to amend or repeal the statute under which the corporation was incorporated. 1993, No. 85, § 4(a).

In 1995, this Court added the following definition of "representative of the client" to the rule of evidence concerning lawyer-client privilege:

A "representative of the client" is (A) a person having authority to obtain professional legal services or act on advice rendered pursuant thereto, on behalf of the client, or (B) any other person who, *while acting in the scope of employment for the client, makes or receives a confidential communication necessary to effectuate legal representation for the client.*

V.R.E. 502(a)(2) (Supp. 1996) (emphasis added). The rule was amended to correspond with the new statute, 12 V.S.A. § 1613. See Reporter's Notes — 1995 Amendment to V.R.E. 502(a)(2). Although the rule is intended to produce the same result as the statute, the drafting is taken from Rule 502(a)(2) of the Uniform Rules of Evidence, which was modified in 1986 to "bring the rule into conformity with *Upjohn Co. v. United States.*" 13A U.L.A. Uniform Rules of Evidence (amended 1986), Prefatory Note to 1986 Amendments, 13 U.L.A. 6 (1994).

Plaintiffs argue that the attorney-client privilege should extend only to the control group of MCA and that Raymond Revoir, the cemetery caretaker, does not fit in that category. Defendants argue that under V.R.E. 502(a)(2)(B) Raymond Revoir was a representative of the lawyer's client, MCA, because he made a confidential communication necessary for the lawyer to represent MCA.

Defendants acknowledge that the communication between Raymond Revoir and their counsel occurred prior to January 1, 1994, the effective date of the privilege statute. The deposition in which the issue arose occurred in August of 1994, after the effective date of the statute, but before the adoption of the amendment to Rule 502. Thus, unless the statute and subsequent rule amendment made no critical change in the law, we must decide whether either or both apply to a

communication that occurred before either was effective.[2] We conclude that neither the statute nor the rule amendment changed the law such as to change the outcome of this case.

Under the original version of Rule 502, plaintiffs can prevail only if (1) the rule is interpreted to limit the privilege to the control group of a corporation or association, or (2) the rule is not so limited, but it nevertheless does not cover the caretaker. We begin by examining the "control group" test.

Prior to the United States Supreme Court decision in *Upjohn Co.*, many of the federal courts adopted the control-group test and used a definition of "control group" similar to that contained in 12 V.S.A. § 1613. See Waldman, *supra*, 28 Wm. & Mary L. Rev. at 481-82. *Upjohn* rejected the control-group test as too limited, primarily because it "overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." 449 U.S. at 390. The Court noted that the information needed by the lawyer will frequently come from employees outside the control group. The Court also criticized the test because it "threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law" by not covering advice to employees who must implement the law, and because it was too uncertain to give lawyers and corporation employees guidance on when their communications would be protected from disclosure. *Id.* at 392-93. The Court held that the privilege covered responses to a questionnaire sent by Upjohn's counsel to all managers of foreign offices covering payments made to foreign government officials to secure government business. See *id.* at 396-97.

Following *Upjohn*, two tests have emerged to define the client in the corporate context: the subject-matter test, and the modified

---

[2] It does not appear that the privilege statute applies to this case at all. To the extent a cemetery association is organized as a corporation, see 18 V.S.A. § 5431 (cemetery associations established after June 1, 1933 are organized as corporations), it is organized as a not-for-profit corporation, see *id.* § 5432. The privilege statute applies only to business, or for-profit, corporations.

The rule is broader and clearly applies to a cemetery association. See Reporter's Notes to V.R.E. 502 (rule covers "every conceivable public or private individual or entity that might seek or obtain legal services"). Rule amendments apply to actions pending on the date of the amendment "except to the extent that in the opinion of the court their application in a particular action pending when they take effect would not be feasible or would work injustice, in which event the former rule or evidentiary principle applies." V.R.E. 1102(b). The parties have not addressed this standard, and we need not decide how we would apply it in this case.

subject-matter test. The subject-matter test takes a broad — and more functional — approach to attorney-client privilege by focusing on the content of the communication rather than the identity of the speaker. Under the subject-matter test, an employee's communication is privileged if the employee makes a statement to a lawyer at the direction of his or her superiors and the subject matter of the statement concerns "the performance by the employee of the duties of his employment." *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 492 (7th Cir. 1970), *aff'd by an equally divided court*, 400 U.S. 348, *reh'g denied*, 401 U.S. 950 (1971).

The modified subject-matter test limits the lawyer-client privilege to those communications made "for the purpose of obtaining legal services or advice." *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977). Thus, combining *Harper & Row* and *Diversified Industries*, a communication is protected under the modified subject-matter approach only if:

> (1) the communication would not have been made but for the contemplation of legal services;
> (2) the employee making the communication did so at the direction of his or her corporate superior;
> (3) the superior made the request of the employee as part of the corporation's effort to secure legal advice or services;
> (4) the content of the communication relates to the legal services being rendered, and the subject matter of the communication is within the scope of the employee's duties;
> (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Southern Bell Tel. & Tel. Co. v. Deason*, 632 So. 2d 1377, 1383 (Fla. 1994).

We agree with *Upjohn* that the control-group test is too limited to implement fully the attorney-client privilege in the corporate or association setting. Thus, we hold that the original version of Rule 502 protected communications beyond those between the lawyer for the corporation or association and the control group of that corporation or association.

We need go no further in our analysis. Although, at the outset, we acknowledged the logical possibility that plaintiffs could prevail under some alternative to the control-group test, there is no alternative that would leave the communications with the caretaker outside the

privilege. The communications between the caretaker and defendants' lawyer were necessary for the lawyer to represent defendants. As our discussion of the merits highlights, the action or inaction of the caretaker, the only employee of MCA, were at the center of this litigation. No matter what addition or alternative to the control-group test we may have adopted, it would have covered communications with MCA's caretaker connected with this litigation. These communications met all the elements of the subject-matter or modified subject-matter tests.

■ If anything, the statute, 12 V.S.A. § 1613, and the amendment to Rule 502 increase the scope of the privilege in the corporate or association setting. Thus, they made no changes in the law that would help plaintiffs. Whether we view the privilege issue under the original version of Rule 502, the amended version or the recent statute, the communications between defendants' lawyer and Raymond Revoir were covered by MCA's attorney-client privilege. The court was correct in denying plaintiffs' motion to direct Mr. Revoir to disclose the contents of these communications.

## IV.

Finally, plaintiffs seek to interview Raymond Revoir outside the presence of defendants' attorney. Defendants respond that it would be unethical for plaintiffs' counsel to conduct the interview because Revoir is a "party" within the meaning of Disciplinary Rule 7-104(A)(1) of the Code of Professional Responsibility, which proscribes ex parte contact with represented parties. The trial court agreed with defendants and denied plaintiffs' motion to allow ex parte contact with Revoir. Rule 7-104(A)(1) provides as follows:

> During the course of his representation of a client a lawyer shall not:
> (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

■ The purpose of the no-contact rule is to prevent adverse counsel from taking advantage of a represented party. See generally S. Sinaiko, *Ex Parte Communication and the Corporate Adversary: A New Approach*, 66 N.Y.U. L. Rev. 1456, 1463-76 (1991). The rule

"shields the opposing party not only from an attorney's approaches which are intentionally improper, but, in addition, from approaches which are well intended but misguided." *Mitton v. State Bar*, 455 P.2d 753, 758 (Cal. 1969). In the absence of counsel, a client may unwittingly make statements that do not accurately or fairly represent the client's position; these statements could later be used against the client as admissions. See V.R.E. 801(d)(2)(D).

■ Like the lawyer-client privilege, the benefits of the no-contact rule are achieved at a cost. A broad proscription on contacting the employees of an adversary hinders the ability of a lawyer to gather and confirm information, to develop an accurate picture of the case, and to advance legal theories. See C. Schaefer, *A Suggested Interpretation of Vermont's DR 7-104(A)(1): The Employment Attorney's Perspective on Contacting Employees of an Adverse Business Organization*, 18 Vt. L. Rev. 95, 106-07 (1993). The no-contact rule is meant to protect the client against overreaching, not the disclosure of prejudicial facts. See *Niesig v. Team I*, 558 N.E.2d 1030, 1034 (N.Y. 1990) (no-contact rule does not immunize underlying factual information from disclosure to adversary). In defining the scope of the rule, we are therefore mindful of both its costs and its benefits.

In recent years, courts have adopted four approaches to the no-contact rule as it applies to corporations: a blanket ban on all employee communications, a control-group ban, an alter ego test, and a balancing test. See generally Schaefer, *supra*, at 112-24; Sinaiko, *supra*, at 1481-93. The blanket rule prohibits contact with all employees of the corporate adversary. See *Public Serv. Elec. & Gas Co. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 745 F. Supp. 1037, 1039 (D.N.J. 1990) (adopting blanket prohibition on any informal contacts with former employees). The control-group test is similar to that discussed above in connection with defendants' privilege claim, and covers the fewest corporate employees or officials. See *Fair Automotive Repair, Inc. v. Car-X Serv. Systems, Inc.*, 471 N.E.2d 554, 561 (Ill. App. Ct. 1984) (adopting control-group test). These two tests represent the extremes currently in use.

The other two tests lie between the extremes. The alter ego test targets those employees whose statements or acts may bind the corporation as well as those employees who are members of the corporation's control group. As formulated in *Niesig*, the definition of "party" under the alter ego test includes "corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation . . . or imputed to the corporation for purposes of its

liability, or employees implementing the advice of counsel." 558 N.E.2d at 1035. A number of courts have recently adopted this approach. See *State v. CIBA-GEIGY Corp.*, 589 A.2d 180, 186 (N.J. Super. Ct. App. Div. 1991) (adopting alter ego test); *Fulton v. Lane*, 829 P.2d 959, 960 (Okla. 1992) (no-contact rule applies to those employees who have legal authority to bind corporation); *Strawser v. Exxon Co., U.S.A.*, 843 P.2d 613, 621 (Wyo. 1992) (adopting alter ego test).

By contrast, the balancing test weighs (1) whether the employee's statements are likely to be admissible against the employer, (2) the employer's need to have counsel present in the particular circumstances of the case, and (3) the plaintiff's need for informal discovery. See *Mompoint v. Lotus Dev. Corp.*, 110 F.R.D. 414, 418-19 (D. Mass. 1986). In *Mompoint*, the plaintiff, who brought an employment discrimination suit against the defendant, claimed that the defendant's asserted reason for the plaintiff's termination — that the plaintiff sexually harassed female employees — was pretextual. See *id.* at 415. Although the female employees' statements were likely to be admissible against the employer, the court found that employer's need to have counsel present was minimal because the employer would probably have its own records of the alleged harassment. See *id.* at 418-19. On the other hand, the plaintiff's lawyer would have difficulty gathering evidence and assessing the strength of the plaintiff's case without free and open discussion with the female employees. See *id.* at 419. The court therefore allowed the plaintiff's lawyer to interview the female employees out of the presence of the defendant's counsel. See *id.*; see also *Curley v. Cumberland Farms, Inc.*, 134 F.R.D. 77, 82 (D.N.J. 1991) (balancing needs of plaintiff against those of defendant and allowing ex parte contact with former employees of defendant); *Frey v. Department of Health & Human Servs.*, 106 F.R.D. 32, 36 (E.D.N.Y. 1985) (applying balancing test).

We reject both of the extremes. The blanket ban unnecessarily prevents all informal discovery from corporate employees. Its only strength is its simplicity. On the other hand, the control-group test is difficult to apply and disregards the ability of low-level employees to bind the corporation.

 As with the attorney-client privilege issue, we need not make a more specific policy choice. Under any alternative to the blanket ban, Revoir is a "party" for purposes of the no-contact rule. DR 7-104(A)(1). As we have previously observed, Revoir's statements are likely to be admissible against his employer pursuant to V.R.E.

801(d)(2)(D). In addition, defendants' lawyer needs to know what Revoir says to plaintiffs' lawyers in order to prepare their defense. Plaintiffs do not need informal access to Revoir in order to prepare their case; the number of witnesses is small and plaintiffs have been able to gather the underlying factual information necessary to bring suit. We therefore affirm the trial court's denial of plaintiffs' motion to interview Revoir outside the presence of defendants' attorney.

*Summary judgment for defendants is reversed and cause is remanded for further proceedings consistent with this opinion; affirmed in all other respects.*

**Johnson, J.**, dissenting. According to the majority, the Missisquoi Cemetery Association and its president may be held liable for failing to anticipate and prevent three boys from discovering a ladder in an old railroad bed off cemetery grounds, hauling the ladder across the grounds, positioning it over the cemetery's fence and against an otherwise unclimbable tree located on neighboring property adjoining the cemetery, scaling the ladder and hammering on a branch overhanging the fence in an effort to build a tree fort, and causing the branch to break, resulting in one of the boys falling and becoming impaled upon the fence. I do not agree that liability may be imposed on defendants for not anticipating this tragic but unforeseeable accident, particularly considering that neither the president of the Association nor the cemetery's caretaker ever saw any children climbing trees or building tree forts on cemetery grounds during the preceding fifteen years. I would hold as a matter of law that, viewing the undisputed material facts in a light most favorable to plaintiffs, a reasonable jury could not conclude that the cemetery breached any duty owed to the decedent or the plaintiffs under the facts and circumstances of this case; accordingly, I would affirm the superior court's order granting summary judgment in favor of defendants. On all other issues, I join the majority's opinion.

The majority's analysis in this case is faulty in several respects. First, the boys were plainly trespassers on cemetery property when the accident occurred. In the majority's view, because the decedent fell from a tree located just outside the cemetery, the boys were not trespassers. This conclusion ignores the undisputed facts that the boys brought a ladder onto cemetery property and placed the foot of the ladder on cemetery land as a means of climbing the tree, and that the decedent had climbed out onto a branch overhanging cemetery property at the time he fell on top of the fence, which the cemetery

owned. Given these facts, the boys were trespassers under any common-sense definition of the term, including the Restatement definition accepted by the majority: a trespasser is one "who enters *or* remains" upon another's land without consent or privilege. Restatement (Second) of Torts § 329 (1965) (emphasis added). The instant case is very different from the cases cited by the majority, wherein persons who had never entered the defendants' property were injured after running into or falling against the defendants' fence.

Although I differ with the majority's conclusion that the boys were not trespassers, I agree that we need not address questions such as whether to abandon status classifications in landowner-liability law, whether to adopt an attractive-nuisance doctrine, or whether to apply any exceptions to the willful-and-wanton standard for trespassers under the circumstances of this case. In short, I concur with the majority's conclusion that we can assume that defendants owed decedent and plaintiffs a duty of ordinary care with respect to any dangerous conditions on cemetery property. In my view, however, even applying the reasonable-care standard, defendants are entitled to judgment as a matter of law.

This conclusion is consistent not only with our case law but also with the dated cases cited by the majority in support of its position. Although the issue of whether a defendant breached a duty of ordinary care is normally a question for the jury, a court can decide the issue as a matter of law when the material facts are undisputed and only one reasonable inference can be drawn therefrom. See *LaFaso v. LaFaso*, 126 Vt. 90, 96, 223 A.2d 814, 819 (1966); Restatement (Second) of Torts § 328B (courts reserve power to make preliminary determination of whether evidence will permit reasonable jury to come to more than one conclusion; where evidence makes it clear that defendant has or has not conformed to applicable standard of care, and that no reasonable jury could reach contrary conclusion, court must withdraw issue from jury).

As the majority acknowledges, the ultimate question in determining whether actionable negligence exists is whether the harm was foreseeable. See *LaFaso*, 126 Vt. at 93-94, 223 A.2d at 817-18 (foresight of harm lies at foundation of negligence; actionable negligence is made out only when it appears that prudent person, in like circumstances, should have reasonably anticipated harm); *Pion v. Southern New England Tel.*, 691 A.2d 1107, 1110 (Conn. App. Ct. 1997) (ultimate test is whether reasonable person in defendant's position, knowing what defendant knew or should have known, would

anticipate that harm suffered was likely to result; if reasonable person in defendant's position could not foresee that type of harm alleged would result from defendant's acts or omissions, plaintiff cannot maintain cause of action). "Simply put, defendant can be found liable only if he has failed to take steps that a reasonable person would take under like circumstances." *Zukatis v. Perry*, 165 Vt. 298, 302, 682 A.2d 964, 967 (1996). The mere possibility of harm is not enough to satisfy the foreseeability test. See *Pion*, 691 A.2d at 1110.

In *LaFaso*, this Court refused to hold as a matter of law that a grandfather's gift of a functioning but fluidless lighter to his three-and-one-half-year-old grandson was not actionable negligence; according to the Court, because reasonable minds might differ on whether the grandfather acted negligently, the jury should decide the issue. See 126 Vt. at 96, 223 A.2d at 819. Similarly, in the cases cited by the majority, courts concluded that the following actions created a jury question as to the defendants' liability: placing a ladder over an open stairwell in a building at a construction site frequented by children, including the four-year-old plaintiff, see *Trobiani v. Racienda*, 238 N.E.2d 177, 179 (Ill. App. Ct. 1968); allowing young children to play on an abandoned oil tank and use the tank to climb a nearby tree, see *Smith v. Springman Lumber Co.*, 191 N.E.2d 256, 257, 258 (Ill. App. Ct. 1963); leaving the remnants of a barbed-wire fence in an area known to be frequented by children, see *Cincinnati & H. Spring Co. v. Brown*, 69 N.E. 197, 197, 198 (Ind. Ct. App. 1903); stringing barbed wire on land frequented by children from the adjoining school yard, see *Barr v. Green*, 104 N.E. 619, 620 (N.Y. 1914); placing one-foot-high flanged stakes in the ground four inches from a public sidewalk), see *Schaut v. Borough of St. Mary's*, 14 A.2d 583, 584, 585 (Pa. Super. Ct. 1940).

I agree that the defendants' actions in each of the above cases created a jury question as to whether the defendants had breached their duty of ordinary care to the plaintiffs. But in each of those cases the harm suffered was reasonably foreseeable, not merely remotely possible. Courts, including this Court, have not hesitated to grant summary judgment, or even judgment on the pleadings, in favor of defendants who could not have reasonably foreseen the harm suffered by the plaintiffs. For example, in *Zukatis*, 165 Vt. at 302-03, 682 A.2d at 966-67, we affirmed the trial court's judgment on the pleadings in favor of defendants accused of failing to prevent a three-year-old child from crawling under their inactivated electric fence and into their pasture, where the child was kicked by their horse. We

concluded that the plaintiffs failed to allege facts demonstrating that the defendants had acted negligently or "that the potential for young children to enter harm's way was substantial enough to warrant 'child proofing' the pasture." *Id.* at 303, 682 A.2d at 967; see also *Pion*, 691 A.2d at 1111 (trial court properly granted summary judgment in favor of defendant telephone company accused of placing repeater box on telephone pole in such close proximity to road as to create hazard to bicyclists straying from road; trial court was correct in determining as matter of law that defendant could not reasonably foresee possibility of accident, and that even if such possibility existed, it was too remote to create duty in defendant); *Foreman v. Consolidated Rail Corp.*, 574 N.E.2d 178, 182-83 (Ill. App. Ct. 1991) (trial court properly granted judgment on pleadings to defendant railroad company accused of failing to fence area that adjoined railway line and that was known to be frequented by children; existence of path used by children and absence of fence was not enough for reasonable jury to conclude that company should have foreseen that eleven-year-old child would attempt to climb onto moving freight train).

Here, by allowing plaintiffs to proceed against defendants under the facts and circumstances of this case, the majority is, in effect, requiring the Association to child-proof its cemetery, an impossible task. The majority contends that a reasonable jury could find that the accident was foreseeable, and thus that the Association should have taken precautionary steps to avoid the accident, because (1) the cemetery gates were open, and children were known to play in and around the cemetery; (2) the fence spikes were dangerous to anyone who came in contact with them, and yet they no longer fulfilled their purpose of keeping persons out of the cemetery; and (3) defendants' caretaker knew that the cemetery fence was dangerous, that the tree from which decedent fell had branches overhanging the fence, and that there was a tree-house structure in a different tree located on cemetery grounds.

Some of these factors relied on by the majority are either irrelevant or insupportable by the undisputed facts of the case; the remaining ones are insufficient to create liability on the part of the Cemetery Association or its president. The cemetery gates were open simply because the cemetery was open to the public. Although defendants were aware that children often rode their bikes through the cemetery and occasionally played in and around the cemetery grounds, the undisputed facts are that the caretaker never saw any children climbing trees or building tree forts in or around the cemetery, and

none of the boys involved in the accident had ever climbed trees or built tree forts in or around the cemetery. The fact that the cemetery was unable to keep out unwanted visitors does not make them liable for the accident.

In determining that this case presents a jury question on negligence, the majority relies principally on the claim that the caretaker, who is not even a defendant in the action, knew that the fence was dangerous, that the tree from which the decedent fell overhung the fence, and that a tree-house structure was present in another tree in the cemetery. First, there are no facts demonstrating that the caretaker knew the fence was dangerous. When asked if anyone had been injured by contact with the fence in the past, the caretaker, who had been at the cemetery over fifteen years, testified that as far as he knew the boy was the first one. In response to interrogatories, the Association stated that it had heard a rumor that on one occasion the gravedigger's son may have injured himself climbing over the fence while helping his father. The president of the Association acknowledged that the four-foot fence would pose a danger to anyone foolish enough to straddle it, but that it was too high for an adult, let alone a child, to attempt such a feat. The decedent's nine-year-old brother testified that he had never attempted to climb the fence. None of these facts demonstrate that the Association could have foreseen that children too small to otherwise be injured by the fence could become impaled on it by falling out of trees on neighboring property adjoining the fence.

Second, the caretaker may well have known that trees on neighboring property had branches overhanging the fence, but there is no evidence that any of these trees had branches low enough to reach without the aid of a ladder. Indeed, the lowest branches in the tree in question, as the exhibits demonstrate, were several feet above the top of the fence and impossible to reach without a ladder.

Third, although the caretaker was aware that some old boards had been left in one of the trees in the cemetery, he testified that the boards had been there undisturbed for at least the fifteen years he had worked for the Cemetery Association. The decedent's brother testified that the structure had no walls or ceiling, but merely a few floor boards.

Finally, two or three days before the accident, the caretaker saw an abandoned ladder lying in an old railroad bed located off cemetery grounds, but thought nothing of it. According to him, different articles were left there from time to time.

From these facts, plaintiffs contend, and the majority agrees, that although there had been no problem in the past with children climbing trees or building tree forts in or around the cemetery, the Cemetery Association should have anticipated that children would see the old boards left in a cemetery tree, get the idea to build a tree fort, discover an abandoned ladder off cemetery grounds, haul the ladder across the cemetery and use it to climb an otherwise unscalable tree that was not on cemetery property but that had branches overhanging a fence too high to straddle, and then injure themselves by falling out of the tree onto the fence. They ask too much from reasonable minds. The tragic accident that led to this lawsuit was the result of a bizarre sequence of events whose likelihood of occurring was so remote that the Association cannot be held liable for failing to anticipate it. If the Cemetery Association can be held liable under the instant circumstances, there are thousands of other landowners in Vermont who will be hard-pressed to assure that they will not be susceptible to future lawsuits for failing to child-proof their property.